579 F.2d 682
 Anthony CANIZZO, Plaintiff-Appellee and Cross-Appellant,
v.
FARRELL LINES, INC., Defendant-Appellant and Cross-Appellee,
and
Universal Terminal and Stevedoring Corp., Defendant-Appellee
and Third Party Plaintiff.
FARRELL LINES, INC., Third Party Plaintiff-Appellant,
v.
FRANK J. HOLLERAN, INC., Third Party Defendant-Appellee.
 Nos. 346, 488, Dockets 77-7292, 77-7332.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 8, 1977.
Decided June 2, 1978.
 
 Jeffrey V. Boxer, New York City, Lilly, Sullivan & Purcell, New York City, for Farrell Lines, Inc.
 Richard J. Cardali, New York City, Cohen & Cardali, New York City, for Anthony Canizzo.
 Albert S. Commette, New York City (Commette, Quencer & Annunziato, New York City, Robert K. Marzik, New York City, of counsel), for Universal Terminal and Stevedoring Corp.
 John T. Shean, New York City (J. Robert Morris, New York City, of counsel), for Frank J. Holleran, Inc.
 Before FRIENDLY, SMITH and NESKIEL, Circuit Judges.
 J. JOSEPH SMITH, Circuit Judge:
 
 
 1
 Farrell Lines, Inc. ("Farrell") appeals from a decision and order of the United States District Court for the Southern District of New York, Charles L. Brieant, Jr., Judge, finding Farrell liable for injuries sustained by appellee Anthony Canizzo in an accident on board Farrell's ship, the S.S. African Comet. The court found Farrell liable for damages in the net amount of $65,628.60, after a deduction which included $8500 per year for remaining earning ability and 40% Contributory negligence, and Canizzo cross-appeals from this reduction in the damage award.
 
 
 2
 For the reasons adduced below, we affirm in part and reverse in part the judgment of the district court and remand the case for further proceedings consistent with this opinion.
 
 I.
 
 3
 This suit commenced with the filing of a complaint against Farrell and Universal Terminal and Stevedoring Corp. ("Universal"), an independent stevedore loading cargo on board the African Comet on the day of the accident. Farrell impleaded Frank J. Holleran, Inc., Canizzo's employer, as a third-party defendant, and filed a cross-claim against Universal. Universal then filed a cross-claim against Holleran. The district court dismissed Canizzo's action against Universal, Farrell's cross-claim against Universal, Farrell's third party complaint against Holleran and Universal's cross-claim against Holleran.
 
 
 4
 On January 12, 1973, the day of the accident, Universal was employed by Farrell to load the African Comet. Holleran provided lashing and carpentry personnel to secure the cargo after it was loaded by Universal. Canizzo worked for Holleran as a carpenter. At approximately 5:00 p. m. Canizzo was instructed to move from one part of the ship to another in order to continue his work. In so doing, he was forced to traverse a narrow passageway between a locomotive stowed on the inshore area of the deck and a nearby hatch coaming. While walking through this passageway, Canizzo slipped on a patch of grease which was partially covered by a pile of wires which lay on the deck. Canizzo sustained permanent injury to his knee, and as a result, is unable to work as a marine carpenter or longshoreman. He is not, however, totally disabled.
 
 
 5
 The trial court found that the ship's crew placed cluster lights and their attached electrical wires in the passageway in question after 4:00 or 4:30 p. m., but at least one-half an hour before Canizzo's accident. The lights, wires, and other clutter which lay on top of the greasy deck created an "obviously dangerous" condition which would have been obvious to any prudent person. The court found that Farrell had actual or constructive notice of this condition inasmuch as the ship's personnel should have seen the grease on the deck when they put out the cluster lights. Furthermore, the crew should have anticipated that Canizzo would be unable to avoid the dangerous condition on the deck. This, the district court believed, was sufficient to bring Farrell within the negligence standard of § 343A of the Restatement (Second) of Torts (1965),[1] which was adopted in this court's opinion in Napoli v. (TransPacific Carriers Corp.) Hellenic Lines, 536 F.2d 505 (2d Cir. 1976).
 
 
 6
 The court found further, however, that Canizzo had been contributorily negligent in failing to walk with sufficient caution, or alternatively, in failing to avoid the wires by taking a different route to the No. 6 hatch. It was further held that Canizzo's damages were reduced, inasmuch as he was capable of earning $8500 per year. Accordingly, the trial court awarded Canizzo $109,381.00 reduced by reason of contributory negligence to $65,628.60.
 
 II.
 
 7
 This suit is brought pursuant to the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 Et seq., as amended. Amendments to the Act passed in 1972 increased levels of compensation payable to injured longshoremen, eliminated the doctrine of unseaworthiness as it pertained to shipowners, made a shipowner's negligence a necessary condition of his liability, and immunized independent stevedore-employers from liability in excess of compensation payments. In the words of the House Report:
 
 
 8
 The Committee believes that where a longshoreman or other worker covered under this Act is injured through the fault of the vessel, the vessel should be liable for damages as a third party, just as land-based third parties in non-maritime pursuits are liable for damages when, through their fault, a worker is injured.
 
 
 9
 (But) the Committee believes that especially with the vast improvement in compensation benefits which the bill would provide, there is no compelling reason to continue to require vessels to assume what amounts to absolute liability for injuries which occur to longshoremen . . . who are injured while working on those vessels.Accordingly . . . it would be fairer to all concerned . . . for the liability of vessels as third parties to be predicated on negligence, rather than the no-fault concept of seaworthiness.
 
 
 10
 (Report of the House Education and Labor Committee, H.R.Rep.No.92-1441, 92nd Cong., 2d Sess., 1972 U.S.Code Cong. & Admin.News, p. 4698 at 4702-03.)
 
 
 11
 See Lubrano v. Royal Netherlands Steamship Co., 572 F.2d 364 (2d Cir. 1978); Ruffino v. Scindia Steam Navigation Co., 559 F.2d 861 (2d Cir. 1977); Munoz v. Flota Merchante Grancolombiana, S.A., 553 F.2d 837 (2d Cir. 1977); Napoli v. TransPacific Carriers Corp., supra, 536 F.2d 505; Landon v. Lief Hoegh & Co., 521 F.2d 756 (2d Cir. 1975), Cert. denied, 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642 (1976).
 
 
 12
 Under the relevant provisions of the Restatement (Second) of Torts (1965), possessors of land, and hence shipowners, are liable for physical harm caused to invitees by dangerous conditions which are not obvious to the invitee (§ 343), but are absolved from liability when dangerous conditions are known or obvious, except when the possessor should anticipate the harm despite the invitee's knowledge or the obviousness of the condition. (§ 343A.)
 
 
 13
 Thus in Napoli, supra, we held that where a longshoreman had fallen from unsecured planks, there was sufficient evidence of the shipowner's knowledge of "obviously dangerous conditions" that were unlikely to be avoided by the longshoreman, that the case should have gone to a jury for a determination of the shipowner's negligence under § 343A of the Restatement (Second) of Torts. 536 F.2d 505.
 
 
 14
 A shipowner, however, can only be liable under § 343A if he knows or should have known of the obviously dangerous, but unavoidable, condition. Ruffino v. Scindia Steam Navigation Co., supra, 559 F.2d at 862; Munoz v. Flota Merchante Grancolombiana, S.A., supra, 553 F.2d 837.
 
 
 15
 While these principles are reasonably clear, considerable legal uncertainty remains in cases in which the negligence of a shipowner combines with the negligence of an independent stevedore to cause injury to a longshoreman. Similarly, when harm is caused by an independent stevedore given complete control over the loading of a ship, it is unclear whether, everything being equal, a shipowner is liable for that harm even when he has knowledge of the dangerous condition caused by the stevedore. See Restatement (Second) of Torts, §§ 409-429; Lubrano v. Royal Netherlands Steamship Co., supra, 572 F.2d 364 at 367 (Moore, J., dissenting); Hickman v. Jugoslavenska Linijska Plovidba Rijeka, "Zvir", 570 F.2d 449 (2d Cir. 1978).
 
 
 16
 Too strict a view of a shipowner's liability in these situations would do much to diminish the salutary effects of the 1972 amendments by, in effect, making shipowners liable, once again, on what is akin to an unseaworthiness standard, but without recourse to contribution on the part of a negligent stevedore. Too lax a view would specifically contradict the congressional intention to make shipowners liable for their own negligence under the amended statute. See Report of the House Education and Labor Committee, H.R.Rep.No.92-1441, Supra, at 4701-02. We are faced, then, with a difficult problem of line drawing which, at this stage in the development of the legal doctrine, is best undertaken on a case by case basis.
 
 
 17
 In the instant case, the trial court found Farrell liable on either of two alternative legal theories. First, it found that the ship's crew placed cluster light wires on top of a patch of grease, thereby creating the dangerous condition which was the proximate cause of Canizzo's injury. Second, it found that, in placing the cluster lights on the deck, the crew observed or should have observed the greasy patch, and was therefore on notice of the obviously unsafe condition aboard ship.
 
 
 18
 These findings rest on the trial court's assessment of the credibility of plaintiff and of two of plaintiff's witnesses, Mazze and Trovato, both of whom were fellow employees and friends of plaintiff and both of whom had unrelated injury claims pending. The court found both biased in plaintiff's favor and rejected portions of the testimony of each, notably that of Trovato that a ship's officer had observed the dangerous conditions at 1:00 or 2:00 p. m. The court did, however, credit the testimony that the grease, wire and cluster light wires existed in the area of the accident, that the grease was there at 1:30 or 2:00, and that the cluster lights had been placed on deck by the ship's company.[2]
 
 
 19
 These conclusions are based primarily on the weighing of testimony by the trier who had the opportunity to observe witnesses Mazze and Trovato on the stand and listen to them under direct and cross-examination, and we find no basis for setting them aside. The existence of a substantial area of grease in a narrow passageway, which should have been known to the ship's personnel, made more dangerous by the positioning by the ship's personnel of the cluster lights and wires upon the greasy area supports the finding of negligence on the part of the ship and justifies the plaintiff's judgment even under the new dispensation.
 
 
 20
 There is a strong presumption in favor of a trial court's findings of fact if supported by substantial evidence. Pampillonia v. Concord Line, A/S, 536 F.2d 476 (2d Cir. 1976), Luigi Serra, Inc. v. SS Francesco C, 379 F.2d 540 (2d Cir. 1967) (maritime negligence). Such findings may be set aside only if clearly erroneous. Rule 52(a), Fed.R.Civ.P. Where no substantial evidence supports a factual determination, it is clearly erroneous, and properly set aside. United States ex rel. Paxos v. Rundle, 491 F.2d 447, 452 (3d Cir. 1974); Hodgson v. Fairmont Supply Co., 454 F.2d 490, 495 (4th Cir. 1972); Shenker v. United States, 322 F.2d 622, 624 (2d Cir.), Cert. denied sub nom. American Stevedores, Inc. v. Shenker, 376 U.S. 907, 84 S.Ct. 659, 11 L.Ed.2d 606 (1963); Apache Powder Co. v. Ashton Co., 264 F.2d 417, 422 (9th Cir. 1959); Cleo Syrup Corp. v. Coca-Cola Co., 139 F.2d 416, 418 (8th Cir. 1943), Cert. denied, 321 U.S. 781, 64 S.Ct. 638, 88 L.Ed. 1074 (1944); see 5A Moore's Federal Practice P 52.03(1); 9 Wright & Miller, Federal Practice & Procedure § 2585 n. 8.
 
 
 21
 Here the question is not so much whether the evidence supporting the findings on liability is substantial as whether it is credible. We are not convinced that the determination of credibility is clearly erroneous, although a contrary ruling might have been supportable.
 
 
 22
 The judgment establishing the ship's liability must be affirmed.[3]
 
 III.
 
 23
 The trial court found that because of Canizzo's experience as a carpenter and his above-average intelligence, he was capable of earning $8500 per year. While we do not quarrel with the court's estimation of Canizzo's intelligence, we are forced to conclude that it has taken an unfounded view of the employment potential of a 58-year-old, partially-disabled marine carpenter who has a history of heart trouble. While Canizzo may be capable of some employment, the record lacks any evidence as to its nature, availability or rate of compensation. The finding that he can earn $8500 per year until his retirement leaves this court "with the definite and firm conviction that a mistake has been committed" and that this finding is consequently clearly erroneous. United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); Schley v. CIR, 375 F.2d 747, 749-50 (2d Cir. 1967); Rule 52(a), Fed.R.Civ.P.
 
 
 24
 Accordingly, we must remand this case for redetermination of Canizzo's damages.
 
 
 25
 The court's dismissal of charges against Universal for failure of proof of Universal's negligence, and its dismissal of charges against Holleran, as forbidden by the terms of 33 U.S.C. § 901 Et seq., as amended, were correct.
 
 
 26
 The judgment of the district court is affirmed on the issue of liability, reversed on the issue of damages, and the case is remanded for further proceedings consistent with this opinion.
 
 
 27
 FRIENDLY, Circuit Judge, dissenting from the holding as to liability:
 
 
 28
 Courts must be exceedingly careful in defining the contours of the longshoreman's action for negligence against the ship, which was preserved by § 905(b) of the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), lest too expansive notions of the ship's duty vitiate Congress' intent to do away with absolute liability for vessels (the "unseaworthiness" doctrine) and make greatly improved compensation benefits the primary remedy for longshoremen and harbor workers. Congress' objective, as is well known, was to curtail the triangular action whereby a longshoreman[1] who had already received compensation benefits from his employer[2] would bring a suit for unseaworthiness against the ship, which in turn would sue the employer. See Munoz v. Flota Merchante Grancolombiana, S.A., 553 F.2d 837, 839-40 (2 Cir. 1977). Much of any recovery by the longshoreman would return to his employer's compensation insurer in satisfaction of its lien; another substantial portion would go to the plaintiff's lawyer and medical experts; and there would be a further transactional cost in the ship's recovery from the employer of its cost of defending against the longshoreman's suit. See, e. g., McLaughlin v. Trelleborgs Angfartygs A/B, 408 F.2d 1334 (2 Cir.), Cert. denied, 395 U.S. 946, 89 S.Ct. 2020, 23 L.Ed.2d 464 (1969). Unless the courts keep the longshoreman's negligence action against the ship within proper bounds, the ship's situation will be worse in some respects than before since it will be deprived of its former third party action against the longshoreman's employer. Moreover, the increased compensation payments, which Congress conceived as the usual source of making the longshoreman whole, will absorb a still larger share of his recovery against the ship with consequent attenuation of any benefit to the injured worker. And all this despite the fact that the employer is generally in a far better position than the ship to prevent accidents to its employees. See Lubrano v. Royal Netherlands S.S. Co., 572 F.2d 364, 370-371 and n. 7 (2 Cir. 1978) (Moore, J., dissenting). Such a result would contravene the objective of Congress whereby
 
 
 29
 . . . adequate workmen's compensation benefits . . . by assuring that the employer bears the cost of unsafe conditions, serves (sic) to strengthen the employer's incentive to provide the fullest measure of on-the-job safety.
 
 
 30
 H.R.Rep.No.1441, 92nd Cong., 2d Sess. (1972), Reprinted in 3 U.S.Code Cong. & Admin.News, pp. 4698, 4699 (1972).[3] Nothing in the language of the statute or prior decisions of this court or others can justify imposition of liability on the ship under such circumstances as are presented here.
 
 
 31
 In retrospect it seems to have been a mistake for courts to give such talismanic significance to §§ 343 and 343A of the Restatement of Torts 2d as has sometimes been done. These sections are awkwardly drafted;[4] the framers had no notion that they would be applied to the tangled situations of ship loading or unloading; and they must be read together with Chapter 15, "Liability of an Employer of an Independent Contractor". In dealing with § 905(b), courts would do better to consider the policies that actuated Congress in adopting the 1972 amendments. In my view Congress did not mean to subject the ship to liability for every dangerous condition known or knowable to it when it had a right to assume that this would be remedied by the employer, as § 941(a) requires. The typical cases where the ship was to be liable under § 905(b) would be for conditions of which it was or should have been aware but of which the employer was not and could not reasonably be expected to be and for affirmative acts of negligence for which the employer bore no responsibility (e. g., when the crew carelessly operated the ship's machinery used in loading and unloading or when such machinery was defective).[5]
 
 
 32
 Decisions in other circuits have emphasized the primary responsibility of the employer and the right of the vessel to assume that this will be discharged. The Third Circuit disapproved a jury instruction that "(t)he responsibility for the safety of the longshoreman lies concurrently or jointly with the longshoreman's employer, and with the shipowner." Marant v. Farrell Lines, Inc., 550 F.2d 142 (3 Cir. 1977). Later, in Hurst v. Triad Shipping Co., 554 F.2d 1237, 1250 n. 35 (3 Cir.), Cert. denied, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977), Judge Hunter noted that
 
 
 33
 creation of a shipowner's duty to oversee the stevedore's activity and insure the safety of the longshoremen would . . . saddle the shipowner with precisely the sort of nondelegable duty that Congress sought to eliminate by amending section 905(b). Every shipowner has the authority to oversee stevedoring operations. If that authority, without more, suffices to charge the shipowner with a responsibility for detecting unsafe methods of operations and warning the longshoremen about them, then shipowners will be back in their pre-1972 position.
 
 
 34
 The Fourth Circuit has taken a similar view. It approved a jury instruction that the primary responsibility for the safety of a repairman on a ship rested upon the shipyard and not upon the shipowner. Riddle v. Exxon Transportation Co., 563 F.2d 1103, 1109 (1977).[6] After noting the "modern" rule of a landowner's liability set forth in §§ 343 and 343A of Torts Restatement and applied by this court in Napoli v. TransPacific Carriers Corporation, 536 F.2d 505 (1976), Judge Russell went on to say:
 
 
 35
 However, even under the modern rule, a vessel is not liable for "open and obvious" dangerous conditions, whether existing at time control of the vessel is relinquished by the vessel or arising afterwards with the knowledge of the vessel, If the danger is such that the stevedore or shipyard would be expected to correct the condition in the course of discharging its responsibility for the safety of the longshoreman or shipyard worker.
 
 
 36
 563 F.2d at 1111-12 (emphasis added). One author has written:
 
 
 37
 The consistent philosophy of these decisions is that in the ordinary situation shipowners are in no position to learn of unsafe conditions or methods arising during the stevedore's operations; when the shipowners do learn of such dangers, ordinarily the stevedore and his employees will have an equal or greater awareness, so that the danger can be said to be open and obvious; and that the safety of stevedoring and other such operations is the primary and usually the sole responsibility of the stevedore.
 
 
 38
 Robertson, Negligence Actions by Longshoremen Against Shipowners Under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act, 7 Journ. Maritime Law & Commerce 447, 473 (1976).
 
 
 39
 No decision of this court requires us to ignore the ship's justifiable reliance on the independent contractors to perform their duty. Napoli v. TransPacific Carriers Corp., supra, 536 F.2d 505, which the district judge regarded as the Fons et origo of imposition of broad liability on the ship, did nothing of the kind. Where, as in that case, there is no independent contractor, it Is part of the ship's duty to exercise reasonable care to inspect its own workers' workplace, to remove grease spills, etc. In such a case there is no "independent contractor" with primary responsibility upon whom the ship may properly rely. As the Napoli court rightly said in rejecting the district court's charge in that case:
 
 
 40
 a charge which relieves a shipowner of liability for a dangerous condition which was "known to the stevedore or to any of its employees" is clearly inappropriate where the shipowner, itself, is the stevedore.
 
 
 41
 Napoli, supra at 508. Things are very different when the longshoreman works for an independent stevedore who has primary responsibility for the workplace. The decision of a divided panel in Lubrano v. Royal Netherlands S.S. Co., supra, 572 F.2d 364, is also distinguishable. In that case there was evidence of direct knowledge and participation of a ship's officer who "approved and joined in the direction that the men keep working, although the dunnage was not there." It was not a case where either the ship did not actually know of the danger and merely "should" have known, nor a case where at most the ship knew of the problem but could rely on others to alleviate it in Lubrano the court found that the ship's officer may have himself ordered the continuance of the dangerous situation.
 
 
 42
 In contrast this court has repeatedly recognized how far the ship may rely upon the independent contractor to rectify dangerous conditions that arise during loading and unloading. Munoz v. Flota Merchante Grancolombiana, S.A., supra, 553 F.2d at 840; Ruffino v. Scindia Steam Navigation Co., 559 F.2d 861 (2 Cir. 1977); Hickman v. Jugoslavenska Linijska Plovidba Rijeka, "ZVIR", 570 F.2d 449 (2 Cir. 1978). The last of this line of cases is Cox v. Flota Merchante Grancolombiana, Docket No. 77-7338, decided May 10, 1978, 577 F.2d 798. There a unanimous panel directed dismissal of a complaint on facts which the majority properly concedes, see fn. 3, are indistinguishable from those in the instant case.[7] While the majority disregards Cox because the opinion was handed down in the face of known disagreement by a majority of this panel, our district judges can scarcely be expected to function with so discordant a chorus on this court.
 
 
 43
 The first basis on which the district judge and the majority would hold the vessel liable knowledge of the accumulation of grease is plainly untenable. When Farrell Lines engaged Universal to load and Holleran to lash the cargo, it was entitled to assume that they would perform the job in a workmanlike fashion, including compliance with the Safety and Health Regulations for Longshoring, 29 C.F.R. 1918.91(c), which require that "slippery conditions shall be eliminated as they occur," and place responsibility for compliance on stevedores. See 29 C.F.R. §§ 1918.2(a); 1918.3(c); Brown v. Mitsubishi Shintaku Ginko, 550 F.2d 331, 333 (5 Cir. 1977). If grease had accumulated on the site of the accident for several hours, the responsibility for removing it or warning workers about it rested primarily on the independent contractors whose employees were regularly on the scene and were or should have been supervised, not on the ship. The ship would therefore certainly not have been negligent if it merely failed to discover the existence of the grease within the hours this assertedly was accumulating. Moreover, even if some unidentified ship personnel might have (or, as the district judge said even less convincingly, "should have") seen the grease when they were "pulling out" cluster lights to help the longshoremen and carpenters assuming there was sufficient evidence for the judge to conclude that this had occurred, which I seriously doubt this does not establish negligence on the part of the ship. First, any knowledge of the unknown deckhands about the grease would be imputable to Farrell Lines only if they had a duty to inform Farrell about it, ALI, Restatement of Agency 2d § 272, which they may not have had, see Id. at § 275 illust. 6, unless, for example, they were ship's officers, for which there was no proof at all. Moreover, even if the ship could be said to have had constructive notice of the condition, there was no reason to think that the independent contractors who were primarily responsible for eliminating or warning about it would not take care of the problem as they were bound to do. This is particularly so since, as the district judge noted, Trovato, a Holleran employee and witness for Canizzo, said he saw the grease at 1:30 P. M. and hence could have reported the condition to his employer for corrective action.
 
 
 44
 There is likewise no merit in the alternative theory that the ship's deckhands aggravated the danger by placing the cluster lights on top of the grease and this aggravation was a substantial factor in causing Canizzo's injury, ALI, Restatement of Torts 2d §§ 430, 431. In the first place, there was no sufficient evidence to support this. Even if the testimony were deemed adequate to sustain the conclusion that the lights were brought out by deckhands rather than the longshoremen, there is no evidence that deckhands were responsible for placing them where Canizzo fell. Also, if the deckhands had placed the lights precisely at that spot, there were wires on the deck before the cluster lights were put out and Canizzo made no claim that he would not have fallen except for the lights. In his contemporaneous accident report he made no mention of the cluster lights, saying only that he "tripped over debris (old gear and wire)," and at trial his account of the accident was simply that he noticed grease on his overalls and shoes after his fall and that on the deck "there was a few wires there, with grease on them, and cluster lights with the wire hanging, you know, all messed up." The basic cause of Canizzo's slipping was, of course, the grease; its removal was the primary responsibility of the independent contractors, not of the ship. Beyond this, if the cluster lights in fact aggravated the danger caused by the grease and the wires, Canizzo's employer had the responsibility and the opportunity to place them elsewhere and the ship was entitled to assume that it would.
 
 
 45
 The judgment should be reversed with instructions to dismiss the complaint.
 
 
 
 [1]
 Section 343A provides:
 (1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.
 
 
 [2]
 While the testimony concerning the cluster lights is to some degree vague and inconsistent, there is some substantial basis for the court to conclude that it was more probable than not that the crew put them out. The longshoremen had often worked this ship and were familiar with its lighting. Trovato testified that "they" put two lights near every hatch and that the ship owns the cluster lights, Canizzo, that the crew takes care of them, Dennen (a Farrell witness by deposition) testified that they are owned by the ship, are ship's gear, are stowed adjacent to the hatch, are made available and are available to where they are needed. Holleran indicated that they were ship's gear but usually hooked up by longshoremen. Davis, a ship superintendent for Universal, by deposition testified that the crew puts the cluster lights out and brings them to the hatch but that either the crew or Universal's men plug them in. There is no indication that the cluster lights in question had yet been hooked up
 
 
 [3]
 Cox v. Flota Merchante Grancolombiana, S.A. was decided May 10, 1978, 577 F.2d 798, while this case was sub judice. Cox seems to us in conflict with at least Lubrano v. Royal Netherlands S.S. Co., 572 F.3d 364 (2d Cir. 1978), among the decisions in this circuit
 While each case must be determined on its own facts, the result in Cox cannot reasonably be reconciled with our result here by the differences in the factual situations, for the proof of ship's negligence in Cox was at least comparable to that here. With all respect, however, we must disagree with the result in Cox. It appears to us to do what the Congress was unwilling to do, abolish the shipowner's liability to the injured longshoreman in negligence as well as in unseaworthiness. As Judge Friendly points out, liability of the ship for such negligence as a greasy deck attributable to the ship's company was specifically contemplated and thought to be preserved by the legislation.
 Litigation in this troubled field would be tidier if the Congress had eliminated altogether the ship's possible liability to longshoremen. There are, however, other considerations.
 Benefits under the Longshoremen's and Harbor Workers' Act have been considerably increased. We cannot overlook the fact, however, that as is usual under workmen's compensation schemes, they do not fully compensate for the loss suffered. If the ship, not a party to the employment contract, is absolved from liability for its own negligence, this uncompensated loss, which may be very great, is shifted from the negligent ship to the often innocent employee. The terms of the statute and the legislative history indicate to us that while Congress was willing to shift the burden of injury without fault to an improved compensation system for shore workers (who arguably never should have been classified with seamen anyway) it was not willing so to shift the burden of injury through the fault of the ship. This policy judgment we would leave to the Congress.
 
 
 [1]
 For simplicity I shall generally use the word "longshoreman" to include all persons covered by the Longshoremen's and Harbor Workers' Compensation Act, and the word "stevedore" to include their employers, although plaintiff Canizzo was a marine carpenter. Cf. 33 U.S.C. § 902(3) and (4)
 
 
 [2]
 Before the 1972 amendments these were often inadequate, see Munoz v. Flota Merchante Grancolombiana, S.A., 553 F.2d 837, 839 (2 Cir. 1977)
 
 
 [3]
 Identical language appears in the Senate Report, No. 92-1125, 92nd Cong., 2d Sess. 2 (1972)
 
 
 [4]
 Section 343A, on which liability is here sought to be predicated, is a statement of when the possessor is Not liable
 
 
 [5]
 This view does not run counter to the case stated in the House Report:
 So, for example, where a longshoreman slips on an oil spill on a vessel's deck and is injured, the proposed amendments to Section 5 would still permit an action against the vessel for negligence. To recover he must establish that: 1) the vessel put the foreign substance on the deck, or knew that it was there, and willfully or negligently failed to remove it; or 2) the foreign substance had been on the deck for such a period of time that it should have been discovered and removed by the vessel in the exercise of reasonable care by the vessel under the circumstances.
 H.R.Rep.No.1441, Supra, 3 U.S.Code Cong. and Admin.News at 4704 (1972). The crucial words are "willfully and negligently" and "in the exercise of reasonable care." Reasonable care does not require the ship to act if it could properly expect that the contractors who were constantly coming and going in the area would do so. See Anuszewski v. Dynamic Mariners Corp., Panama, 391 F.Supp. 1143, 1149 (D.Md.1975), Aff'd, 540 F.2d 757 (4 Cir. 1976), Cert. denied, 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977).
 
 
 [6]
 In support of this the court stated in footnote 9:
 See, for instance, Ramirez v. Toko Kaiun K.K. (N.D.Cal.1974) 385 F.Supp. 644, 653; Lucas v. "Brinknes" Schiffahrts Ges. (E.D.Pa.1974) 379 F.Supp. 759, 768.
 In the first case, the Court said:
 "The primary responsibility for the safety of a longshoreman lies with the stevedoring company."
 In Lucas, the Court said:
 " * * * It is clear, however, that Congress decided that the primary duty to provide a safe place to work is on the stevedore."
 In Brown v. Ivarans Rederi A/S (3d Cir. 1976) 545 F.2d 854, 860 (U.S. appeal pending), the Court said:
 " * * * However, express language in the statute and the legislative history reports accompanying the 1972 Amendments amply demonstrate that for reasons of policy the major responsibility for the proper and safe conduct of the work was to be borne by the stevedore."
 563 F.2d at 1109 n. 9.
 
 
 [7]
 Indeed the facts in Cox were stronger for the employee. There was evidence that placing pins in the beams was the ship's responsibility and that a mate had agreed with the hatch boss to supply them