**Donald F. PFEIFFER, Plaintiff-Appellant,**

v.

**William S. SILVER, Defendant-Appellee.**

**No. 1244, Docket 83–7076.**

United States Court of Appeals, Second Circuit.

Argued April 25, 1983.

Decided July 15, 1983.

Ira B. Grudberg, New Haven, Conn. (Jacobs, Grudberg & Belt, P.C., David L. Belt, Susan H. Bartholomew, New Haven, Conn., of counsel), for plaintiff-appellant.

Brian M. Gildea, New Haven, Connecticut (Celentano & Gildea, New Haven, Conn., Michael P. Koskoff, Koskoff, Koskoff & Beider, Bridgeport, Conn., of counsel), for defendant-appellee.

Before LUMBARD, NEWMAN, and PRATT, Circuit Judges.

LUMBARD, Circuit Judge:

On a sunny, clear November 1978 Sunday afternoon in Hamden, Connecticut, plaintiff, Donald F. Pfeiffer, then 20 years old, went riding on his motorcycle, a 1977 or 1978 Kawasaki 500. As Pfeiffer rode south down State Street, his motorcycle collided with a two door 1977 BMW sedan which was making a left turn onto Sebec Street across the southbound lane of State Street from that street's northbound lane. The BMW was owned and operated by defendant, Dr. William S. Silver, a 36 year old New York resident. Silver's wife, Eleanor, was in the front passenger seat, and the Silvers' 10 month old daughter was secured in a special child's chair on the automobile's rear seat. Pfeiffer was thrown more than 57 feet from the point of impact and suffered serious injuries.

Invoking diversity jurisdiction, Pfeiffer, on February 11, 1980, sued Silver in the District of Connecticut, contending that his injuries were caused by Silver's negligence. Specifically, he alleged that Silver, in violation of statutory and common law requirements of due care, had failed to keep a reasonable lookout, to give Pfeiffer his right of way, and to make a proper and safe left turn. Silver denied these allegations and countered that Pfeiffer's injuries were caused by Pfeiffer's own negligence.

On December 22, 1982, after a three day bench trial covering the issues of liability and damages, the district court, Thomas F. Murphy, *Judge*, finding that Silver's BMW had the right of way in making its left hand turn onto Sebec Street, dismissed Pfeiffer's complaint on the ground that Pfeiffer had not shown Silver's negligence by a fair preponderance of the evidence. Thus, the district court did not reach either the question of Pfeiffer's own negligence or the question of damages. The court's determination as to who had the right of way was based on its findings that Pfeiffer was driving his motorcycle "at an excessive and unlawful speed and [was] not in control of his vehicle" and that the BMW "had almost completed its turn when it was hit by plaintiff's motorcycle coming from the west side of State [Street] at an excessive and unlawful speed."

Contending that the district court's findings as to the motorcycle's speed and the point in the intersection at which the collision occurred were clearly erroneous, Pfeiffer argues that the district court erred in determining that the BMW had the right of way. Moreover, he asserts that even if the BMW had the right of way, the district court erred in not finding that Silver failed to keep a proper lookout for oncoming traffic after he initiated his left turn.

Reviewing the record, we agree that the district court's findings were clearly erroneous. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

I.

Most of the basic facts are undisputed. At about 1:45 p.m. on Sunday, November 5, 1978, Pfeiffer left his home in Hamden on his motorcycle. Pfeiffer had consumed no alcoholic beverages that day. Pfeiffer drove south on State Street in Hamden. The afternoon was sunny and clear, visibility was good, and the road was level and dry. There were no leaves on the road and the sun was not in the eyes of drivers traveling in either direction. There was almost no traffic on State Street, a 40 foot

wide, two lane asphalt road running north to south. The investigating officer from the Hamden Police Department, Thomas R. Regan, testified that the posted speed limit on State Street was between 40 and 45 miles per hour and that he believed, but was not completely certain, that the posted speed limit was 40 MPH in the area of the accident.

Meanwhile, Silver and his family, who were on a visit to Silver's sister in Hamden, were traveling on State Street's northbound lane. To arrive at his sister's house, Silver had to make a left turn across State Street's southbound lane onto Sebec Street. Sebec Street is 27 feet wide and intersects State Street only from the west. Officer Regan testified, and all the parties agree, that there are at least 1,000 to 1,500 feet of unobstructed visibility along State Street both to the north and to the south of Sebec Street.

Silver testified that he was looking 100 to 200 feet ahead as he approached the intersection. Seeing no oncoming traffic, he activated his left turn signal, slowed down to about 15 MPH, and made a left turn onto Sebec Street. After initiating his left turn, Silver stopped looking north on State Street and focused his attention on Sebec Street. Silver never saw Pfeiffer's motorcycle until an instant before the collision when his wife, who first saw the motorcycle when it was only 20 to 30 feet from the car, shouted: "There is a motorcycle!" Silver acknowledged that he never would have seen the motorcycle if his wife had not called out. When Silver finally saw Pfeiffer, Pfeiffer was only 10 feet from the car. Silver conceded that no more than "a few seconds" could have elapsed between the time when his BMW crossed the center line of State Street and the time when the collision occurred.

Pfeiffer testified that after seeing the BMW cross over the center line, he braked and started to downshift the motorcycle's gears. As the motorcycle began to skid, Pfeiffer's head was forced down and he was lifted off the seat. The motorcycle collided with the rear portion of the right passenger door of Silver's BMW, approximately 6 to 7 feet from the car's rear bumper. Pfeiffer was thrown more than 57 feet from the point of impact and suffered injuries to his head, skull, and left wrist and sustained a tear in the omentum in his abdomen.

## II.

Pfeiffer's complaint alleged that Silver made an improper left turn in violation of § 14–242(e) of the Connecticut General Statutes, Conn.Gen.Stat. § 14–242(e) (West Supp.1983–84), and failed to keep a proper lookout. In pertinent part, § 14–242(e) provides: "The driver of a vehicle intending to turn to the left within an intersection ... shall yield the right of way to any vehicle approaching from the opposite direction which is ... so close to such intersection ... as to constitute an immediate hazard." The Connecticut Supreme Court has interpreted "immediate hazard" to mean that the oncoming vehicle is "so close thereto that a reasonably prudent person, in the [left turner's] situation and intending to make a left turn, would believe that if he did make and complete the left turn, there would be an immediate danger or risk of collision, even though it might not be a certainty." *Pinto v. Spigner,* 163 Conn. 191, 196, 302 A.2d 266, 269 (1972) (quoting *Kronish v. Provasoli,* 149 Conn. 368, 372, 179 A.2d 823, 825 (1962)); *see Affinito v. Daniels,* 179 Conn. 388, 389–90, 426 A.2d 782, 783 (1979). If the oncoming vehicle is not an "immediate hazard," the vehicle making the left turn has the right of way. *Affinito v. Daniels, supra,* 179 Conn. at 389, 426 A.2d at 783; *Pinto v. Spigner, supra,* 163 Conn. at 196, 302 A.2d at 269. Moreover, Connecticut law holds that a driver, even if he has the right of way, is "required to keep a reasonable lookout for any persons and traffic he is likely to encounter, and he is chargeable with notice of dangers [the existence of which] he could become aware by a reasonable exercise of his faculties." *Pinto v. Spigner, supra,* 163 Conn. at 195, 302 A.2d at 268; *see Fox v. Fox,* 168 Conn. 592, 596, 362 A.2d 854, 857 (1975). Whether a vehicle is so close to an intersection as to

constitute an "immediate hazard" and whether a driver has maintained a proper lookout are questions of fact. *See Pinto v. Spigner, supra,* 163 Conn. at 195–96, 302 A.2d at 268–69.

Finding that Silver, not Pfeiffer, had the right of way under § 14–242(e), the district court concluded that Pfeiffer had failed to prove Silver's negligence by a fair preponderance of the evidence, and therefore it dismissed Pfeiffer's complaint. Implicit within the court's dismissal was also a conclusion that Silver had maintained a proper lookout prior to and during his left turn. The court's determination that Silver had the right of way was based on its findings that Pfeiffer was traveling on State Street's southbound lane at an excessive speed and was not in full control of the motorcycle and that Silver's BMW had almost completed its turn onto Sebec Street when it was hit. Noting that Pfeiffer "seemed to come out of nowhere," the district court apparently reasoned that, in light of Pfeiffer's excessive speed and the BMW's position at impact, Pfeiffer was not close enough to the intersection to constitute an "immediate hazard" or to be discernible by a proper and reasonable lookout.

Pfeiffer contends that the district court's findings of fact with respect to his motorcycle's speed and the BMW's position are clearly erroneous, and he argues, therefore, that the district court erred in concluding that Silver had the right of way and maintained a proper lookout. We agree.

### A. *The Excessive Speed Finding.*

■ In finding that Pfeiffer's motorcycle was traveling at an excessive speed, the district court focused on Pfeiffer's "admission" that he was at the intersection of State and Daniel Streets, 1,000 feet to the north of Sebec Street, when he first saw the BMW making its turn. The district court presumably believed that the motorcycle must have been going at a great speed to have been able to traverse 1,000 feet of State Street and hit the BMW during the "few seconds" between the commencement of the BMW's turn and the moment of

impact. This finding, however, is incredible. If only two seconds actually elapsed, the motorcycle could have covered the 1,000 foot distance only if it were traveling at about 341 MPH, and even if as much as five seconds elapsed, a speed of 136 MPH would still have been required to traverse the distance. Moreover, both parties agree that there is no evidence in the record to support the court's finding. Pfeiffer never testified that he saw the BMW commence its turn from 1,000 feet away. In fact, in his testimony, Pfeiffer stated that he was at most 40 feet from the BMW when he first saw it cross the center line. Apparently, the district court erroneously extracted the 1,000 foot figure from Pfeiffer's testimony that he was at Daniel Street, 1,000 feet north of Sebec Street, when he was first able to observe the intersection of Sebec and State Streets. Indeed, on cross-examination, Pfeiffer affirmed his earlier testimony that he was within 40 feet of the BMW when he saw it turn, and he explicitly rejected opposing counsel's suggestion that he first saw the car turn when he was at Daniel Street. As no evidence supports the finding that Pfeiffer was 1,000 feet away when the BMW commenced its turn, that finding is clearly erroneous. *Canizzo v. Farrell Lines, Inc.,* 579 F.2d 682, 686 (2d Cir.), *cert. denied,* 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978).

Another factor in the court's excessive speed determination was its finding that after Pfeiffer saw the BMW cutting across the lane "he downgraded his gears from 5 to 1 and he did this by tapping (we assume with the toe of his shoe) for each gear, 5, 4 3, 2, 1. . . ." In light of Pfeiffer's testimony that it took him two seconds to react to the left turning BMW, the court may have believed that if Pfeiffer had sufficient time to shift properly through four gears, he must have been driving at an excessive speed, and thus he must have been a good distance away from the BMW when it commenced its turn. This finding also is not supported by the evidence. Pfeiffer did testify that he "put on the brake and . . . started downshifting" about two seconds after seeing the BMW turn in front of him.

He was unable to say, however, whether he actually downshifted from fifth to first gear. His only recollection was that he "banged them all" and that the resulting increase in engine revolutions "seized the engine." This testimony comports with both Pfeiffer and the Silvers' repeated assertions that the incident happened very fast. Accordingly, we believe that the only conclusion that can be gleaned from the testimony is that Pfeiffer only attempted to downshift to the lowest gear. Thus, even if it cannot be said that there is no evidence to support the district court's finding with respect to the gear changes, for the reasons we have stated we are left with a "definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *see Miles v. New York State Teamsters Conference Pension & Retirement Fund Employee Pension Benefit Plan,* 698 F.2d 593, 600 n. 5 (2d Cir.1983).

■ Silver argues, however, that even if the findings with respect to the 1,000 foot distance and the gear changes are clearly erroneous, the district court's determination as to excessive speed is still supported by the Silvers' testimony that the motorcycle was traveling at a speed between 45 to 50 MPH and by the undisputed fact that Pfeiffer lost control of the motorcycle after he began to brake and to attempt to shift gears. We disagree. The district court, recognizing the imprecise nature of lay testimony concerning speed which is based only on very brief periods of observation, expressly discounted the probative value of this testimony. Moreover, the fact that Pfeiffer may have been traveling at a maximum speed of 50 MPH, though relevant to the issue of Pfeiffer's own negligence, does not support the district court's finding that Pfeiffer's speed was so excessive that he literally "seemed to come out of nowhere." A speed of 50 MPH approximately equals 73 feet per second. If, as Silver's testimony suggests, the elapsed time between the commencement of the turn and the collision was only 2 to 3 seconds, the motorcycle would have had to be within or just outside of the 100 to 200 foot area north of Sebec Street that Silver was observing as he initiated his left turn. Even if the time elapsed were 5 seconds, Pfeiffer would still have only been about 365 feet from the BMW as it began its turn. Finally, the fact that Pfeiffer lost control of the motorcycle after seeing the BMW turn does not lead to a conclusion that Pfeiffer was a great distance from the BMW when he saw it. Indeed, such a conclusion is inconsistent both with Pfeiffer's testimony that he was close to the car when he began the emergency braking and gear shifting procedures which caused him to lose control of the vehicle and with Officer Regan's testimony, which was not explicitly rejected by the district court, that he observed a "single [tire skid] mark approximately 42 feet in length" which "appeared to have come from the motorcycle" and which ended "10 to 12 feet" from the point at which he determined the collision to have occurred.

Accordingly, although Pfeiffer may have been traveling at a speed exceeding the legal speed limit, and although this fact may be pertinent to a determination of Pfeiffer's own negligence, we reject as clearly erroneous the district court's finding that Pfeiffer's speed was so excessive that he "seemed to come out of nowhere." We conclude, therefore, that Pfeiffer, far from being 1,000 feet from the BMW when it began to turn, was in fact much closer to the car, perhaps no more than 300 to 400 feet and possibly less.

### B. *The Position of the BMW at the Moment of Impact.*

■ Also important to the district court's determination that the BMW had the right of way was its finding, which we believe erroneous, that the car "had almost completed its turn when it was hit by plaintiff's motorcycle coming from the west side of State [Street]." Apparently, the district court believed that the fact that the BMW had almost finished its turn when it was struck by Pfeiffer's motorcycle indicated that, when Silver looked up State Street, Pfeiffer had not been so close as to consti-

tute an "immediate hazard" or to be within the range of a proper lookout.

In reaching this finding, the district court relied on the Silvers' testimony that less than a quarter of the BMW, "about 6 feet" according to Silver, was sticking out onto State Street at the moment of collision, that the motorcycle was traveling on the extreme west side of the road as it approached the BMW, and that the car did not move an appreciable distance onto Sebec Street after it was hit. The district court also noted that photographs, taken at the scene of the accident after the vehicle had come to rest and showing the BMW to be in a position parallel to State Street and almost entirely on Sebec Street, supported the Silvers' testimony that the BMW had almost completed its turn.

In so finding, the district court rejected both Pfeiffer's testimony that he was traveling in the center of State Street's southbound lane and Officer Regan's sketch of the accident. The sketch, based on measurements and observations made by Officer Regan at the scene of the accident, showed the point of impact to be in the middle of the southbound lane and indicated that a 42 foot skid mark, stopping 10 to 12 feet from the estimated point of impact and appearing to come from the motorcycle, existed in the center of the southbound lane. The district court rejected the sketch on the grounds that its representation of the 42 foot skid mark was "grossly out of proportion" with its other representations and that its representation of the position of the car at impact was "grossly different from the photographs." The district court, however, offered no comment about Officer Regan's direct testimony that the skid mark was in the center of the southbound lane and was made by Pfeiffer's motorcycle.

We believe that the district court's finding as to where the impact occurred is clearly erroneous. The photographs, which were used to support the Silvers' testimony as to the position of the car at the moment of impact, could not be dispositive proof of the BMW's position since they merely showed the position of the vehicles *after* the

collision occurred. Thus, the Silvers' testimony on the subject, as indicated by the court, was crucial to its finding. This testimony is not only contradicted by Officer Regan's unquestioned direct testimony as to the existence of the motorcycle's skid mark in the center of the southbound lane, but it also appears incredible. Although Silver testified that only 6 feet of the car were sticking out in a perpendicular direction onto State Street when the impact occurred, it is uncontroverted that the point of impact on the BMW itself was 6 to 7 feet from the car's rear bumper. This would mean that the motorcycle would have had to hit the car either on Sebec Street itself or right at the junction of Sebec and State Streets. Because there is no evidence other than the Silvers' testimony to support this conclusion, and because the Silvers' testimony is directly contradicted by the evidence of the skid mark, we believe that the district court's finding as to where the collision occurred is erroneous. *See Honeycutt v. Ward,* 612 F.2d 36, 40 (2d Cir.1979) (trial court's finding can be disregarded where finding is based on oral testimony and "some undisputed fact renders the credibility of the oral testimony extremely doubtful") (quoting *Orvis v. Higgins,* 180 F.2d 537, 539 (2d Cir.1950), *cert. denied,* 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595 (1950)), *cert. denied,* 446 U.S. 985, 100 S.Ct. 2969, 64 L.Ed.2d 843 (1980). Moreover, we note that the Silvers' testimony that the BMW did not move any appreciable distance forward or backward after it was hit, which appears to have been used by the court to support its determination that the photographs and not Officer Regan's sketch indicated more correctly the position of the car at impact, is in fact inconsistent with Silver's testimony that the car was still in motion and that he did not apply the brakes after seeing the motorcycle. Accordingly, the trier could not fairly find that the BMW was three quarters or more onto Sebec Street when it was hit or that Pfeiffer was traveling down State Street on the extreme western side of its southbound lane.

### III.

In our opinion, the evidence does not support either the district court's express determination that Silver's BMW had the right of way or its implicit determination that Silver maintained a proper lookout. Simply stated, in light of the facts that Silver had an unobstructed view up 1,000 to 1,500 feet of State Street as the motorcycle proceeded southbound on that street, that the motorcycle had to be close to the BMW as the car started its turn, and that the car was not almost entirely onto Sebec Street when it was hit, the only inferences that can be drawn are that, when Silver turned left, Pfeiffer was an "immediate hazard" and Silver should have seen him. *See Pinto v. Spigner, supra,* 163 Conn. at 194–96, 302 A.2d at 268–69 (reversing directed verdict in favor of left turning motorist who collided with oncoming motorcycle where motorcyclist was visible for distance of 670 feet and where motorist never saw motorcyclist and never turned to look at oncoming lane after she commenced her turn). We hold, therefore, that Silver was negligent as a matter of law. Although it seems clear on this record that Silver's negligence was the principal, if not sole, cause of Pfeiffer's injuries, we are hesitant to reach any firm conclusion as to the extent of Silver's liability in light of Connecticut's comparative negligence statute which only allows a contributorily negligent plaintiff a proportionate recovery if "the [contributory] negligence was not greater than the combined negligence of the person or persons against whom recovery is sought ...." Conn.Gen.Stat. § 52–572h(a) (West Supp. 1983–84). Accordingly, we reverse the district court's judgment and remand for further proceedings to determine, in accordance with Connecticut law, the extent of Silver's liability and the amount of damages to which Pfeiffer is entitled in light of Silver's negligence and Pfeiffer's negligence, if any.

We retain jurisdiction.

Reversed and remanded.