Anthony MUNOZ, Plaintiff-Appellee,

v.

FLOTA MERCHANTE GRANCOLOMBI-ANA, S.A., Defendant-Appellant.

No. 800, Docket 76–7519.

United States Court of Appeals, Second Circuit.

Argued April 6, 1977.

Decided April 25, 1977.

Thomas E. Stiles, New York City (Giallorenzi & Stiles, New York City, of counsel), for defendant-appellant.

Morris Cizner, New York City (Zimmerman & Zimmerman, New York City, of counsel), for plaintiff-appellee.

Lawrence J. Mahoney, New York City (E. D. Vickery, Royston, Rayzor, Vickery & Williams, Houston, Tex., and Dougherty, Ryan, Mahoney, Pellegrino & Guiffra, New York City, of counsel), for amici curiae.

Before KAUFMAN, Chief Judge, LUMBARD and VAN GRAAFEILAND, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

Much like ancient mariners who puzzled over the Greek god Triton and the mermaids, modern judges and legislators often have been vexed in their attempt to ascertain a proper legal classification for the longshoreman. Bound at once to the seafaring trade and mainland commerce, the harbor worker frequently found himself in the anomalous position of being land-based but regarded, nevertheless, as a seaman in the eyes of the law. One of the most confusing instances of this phenomenon was the litigation spawned by work-related personal injuries.

In an effort to bring order out of chaos, Congress amended the Longshoremen's and Harbor Workers' Compensation Act (LHWCA) in 1972 to clarify and limit the circumstances under which the employee of a stevedore could recover damages from a shipowner for on-the-job accidents. In this case we believe that the district judge misconstrued the statute and the intent of Congress when he permitted the jury to find a non-negligent shipowner liable for injuries suffered by a longshoreman. Accordingly, we reverse the judgment of the district court, and direct that judgment be entered for the defendant-appellant dismissing the complaint.

## I.

The undisputed facts may be stated briefly. On November 3, 1973 the CIUDAD DE IBAQUE arrived in Brooklyn to discharge and load cargo. The ship's owner, appellant Flota Merchante Grancolombiana, contracted with Universal Maritime Services (UMS) for the rendition of all stevedoring services. Shipping companies engage stevedores to load and unload goods from their ships because the work requires unusual expertise. In addition, the regulations of the International Longshoremen's Association prohibit crew members of foreign flag ships, such as the CIUDAD DE IBAQUE, from performing this type of labor.

UMS had discharged all freight from the ship's No. 3 hatch by 10:30 A.M. on November 5, and proceeded to load the hold. Two groups of longshoremen labored until 9 P.M. to pack the forward portion of the stowage compartment. The following morning UMS hired several additional longshoremen including the appellee, Anthony Munoz, to assist in the loading operation. Soon after his arrival at 9 A.M. Munoz was assigned to work in the No. 3 lower hold. Unable to reach his destination from the lower 'tween deck by the accustomed route because the forward escape hatch was blocked with cargo, the appellee was compelled to climb below on a wooden ladder located in the middle area (i. e. square) of the hatch.

Once below Munoz joined other UMS employees in stowing large rolls of paper used in printing news in the square of the hatch, aft of the cargo that the longshoremen had stored on the previous day. As each row of cylinders was laid, the workers put plywood boards—"dunnage"—on top to afford them a level area upon which to place another layer of drums. Before this process was completed one of the rolls of paper became wedged against another. Munoz, who decided that a tool was required to dislodge the cylinder, saw a crowbar several feet away from him on a "pathway" that led to the forward escape hatch. UMS employees had constructed this walkway on the preceding day by arranging boxes of cargo in step-like tiers proceeding upward toward the 'tween deck. The path was covered with separation paper—thin sheets used to divide goods destined for different ports.

Munoz stepped from the dunnage boards to the pathway and walked in a crouched

fashion for one or two steps when he felt the cargo beneath him shift. The appellee then fell forward. He reached ahead to cushion his landing, but emerged from the incident with a sprained wrist and fractured small finger.

The appellant shipowner moved for a directed verdict at the close of Munoz's case, and renewed the motion before the jury commenced its deliberations. Judge Weinfeld reserved decision and directed the jury to return a special verdict in the form of answers to six questions.[1] After less than two hours the jury concluded that the shipowner's negligence was the sole cause of Munoz's injuries, and awarded the appellee $13,000. In post-trial briefs the appellant again urged, based on the Act as amended, that the verdict be set aside and the complaint dismissed. Judge Weinfeld denied these motions and entered judgment for the longshoreman. This appeal followed.

## II.

The shipowner's responsibility for maritime accidents cannot follow from mere invocation, without more, of the talismanic claim of "negligence." Congress, by its extensive overhaul of the LHWCA in 1972, sought to achieve several goals: adequate, increased and sure compensation for injured longshoremen, elimination of the rubric of liability without fault for shipowners, and encouragement of safety within the industry by placing the duty of care on the party best able to prevent accidents. Application of these principles to the instant facts mandates reversal.

Prior to 1972 unconscionably meager benefits paid pursuant to the LHWCA forced injured workers to seek judicial redress. In attempting to circumvent the clear injustice of inadequate awards, the courts not only created a procedural thicket for the litigants but also undermined the foundation of the compensation system. Thus we observed the Supreme Court sanctioning the maintenance of a direct third party action by an injured longshoreman against the shipowner. *Seas Shipping Co., Inc. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1948). Since the harbor worker was not employed by the owner but by an independent contractor—the stevedoring company—liability was grounded on the doctrine of unseaworthiness. Reasoning that longshoremen were subject to hazards identical to those experienced by seamen, who at one time had performed stevedoring services, the Court placed upon the shipowner absolute financial responsibility for anyone working on the ship with his consent. The "fortuitous circumstance" of who actually *employed* the longshoreman would not create a barrier to the solicitude of the law of admiralty for its "wards."

Less than a decade later the circle was closed. In *Ryan Stevedoring Co. v. Pan Atlantic S.S. Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the Court permitted a shipowner as a third party plaintiff to implead and recover against the longshoreman's employer the amount of any award given to the longshoreman in his suit. Basing recovery over on breach of the stevedore's "warranty of workmanlike service" —a consensual obligation to stow cargo in a reasonably safe manner—this procedural expedient removed from shipowners the burden thrust upon them of redressing injuries caused solely by the negligence of the expert independent contractor or his employees. Thus the anomalous situation arose in which the stevedore, whose participation in a workmen's compensation scheme

1. The judge required the jury to answer the following queries:

1) Do you find plaintiff has sustained his burden of proof of negligence?
2) Do you find that the defendant has sustained its burden of proof, that is, that the plaintiff by his own conduct contributed to the accident?
3) If your answer to question 2 is in the affirmative, to what extent?
4) If in answer to question 1 you have found that plaintiff has sustained his claim, what is the total amount of damages?
5) If you found that defendant sustained its claim that plaintiff himself contributed to the occurrence, what sum have you deducted from the above?
6) The net amount of the verdict.

precluded direct actions for negligence by his employees, became liable, nevertheless, in a court of law for the very injury that the compensation system was designed to remedy.

Congress responded to pleas for aid from all parties by revising the LHWCA in 1972. The triangular anomaly described above was replaced by statutory authorization for a direct action by the injured longshoreman against the vessel.[2] The worker could recover only for injuries proximately caused by the shipowner's negligence—not unseaworthiness. The stevedore-employer no longer could be impleaded and fear of the coercive effects of unequal bargaining power led Congress to prohibit even voluntary indemnification accords. Federal courts were to fashion a uniform law of negligence in future cases, based not upon the doctrine of seaworthiness or "non-delegable duty," but by analogy to land-based common law tort principles.

The amended Act is a paradigm of political compromise. Injured workers would enjoy significant improvement in the level of benefits. The stevedore-employer, now rid of the yoke of indemnification suits, would be induced to insure employee safety by increased compensation awards. Shipowners no longer could be held under the rubric of unseaworthiness—a euphemism for absolute liability—for injuries suffered onboard the ship by harbor workers. Congress specifically found the rationale that justified holding shipowners liable without fault for injuries incurred by seamen—the extreme hazards of long oceanic voyages and the duty of strict obedience to orders—inapplicable to longshoremen. Accordingly, all actions against shipowners by harbor workers had to be premised solely upon the shipowner's negligence. "[T]he vessel shall not be liable as a third party unless it is proven to have acted or have failed to act in a negligent manner such as would render a landbased third party in non-maritime pursuits liable under similar circumstances." Report of the House Education and Labor Committee, H.R. Rep. No. 1441, 92d Cong., 2d Sess., 1972 U.S. Code Cong. & Adm. News pp. 4698, 4704. Thus, with a stroke of the pen, the profusion of words written on the "round robin" litigation by the courts evaporated.

The proper determination of this case flows ineluctably from an application of these principles to the instant facts. The appellant contracted with an experienced stevedore to load its ship and, relying entirely upon its expertise, in effect, gave complete control of the hold to UMS. Moreover, union regulations forbade crew members from assuming any role in the enterprise. UMS, however, stowed the cargo in such a manner as to create a latent, dangerous condition upon which one of *its* employees was injured. There was not a shred of evidence that the shipowner knew of the defect and it is undisputed that the owner delivered the premises to UMS in a safe condition. It would, in our view, contravene the clear congressional intent and scheme to approve recovery against Grancolombiana in this case. The shipowner had no duty to supervise the minute details of work totally entrusted to the competence of the stevedore. Indeed, commercial reality and applicable union regulations preclude a

2. In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreement or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

33 U.S.C. § 905(b).

rule that would require a non-expert constantly to intrude on the work of a master stevedore in the deepest recesses of the ship.

The appellee argues, however, that the shipowner in the exercise of reasonable care should have discovered and corrected the hidden defect in the stevedore's makeshift pathway leading to the escape hatch that caused Munoz's fall. We reject this contention which is reminiscent of the claims asserted prior to 1972 and which in great measure led to amendment of the Act. It would portend a return to the era of "nondelegable duty" that was so unceremoniously ushered out by Congress only five years ago. Indeed, if Munoz's recovery were allowed to stand, the overriding congressional concern for safety in the industry would be set at naught. Since the stowing of cargo in the lower hold of the CIUDAD DE IBAQUE was peculiarly the responsibility of UMS, we would be remiss in our duty to other harbor workers if we required the owner to pay for the stevedore's negligence. All incentives for the stevedore to monitor unsafe procedures then would be lost for under the Act the stevedore is immune from indemnity actions.

The appellee concedes that our opinion in *Napoli v. Hellenic Lines, Ltd.*, 536 F.2d 505 (2d Cir. 1976) is distinguishable. There, we adopted the standard enunciated in § 343A, Restatement of Torts,2d,[3] and held that the district court erred in instructing the jury that the shipowner owed no duty to warn longshoremen of an *open* and *obvious* dangerous condition. The defect here, of course, was *latent* and was *created by the stevedore*. We therefore prefer the guidance afforded by *Gay v. Ocean Transport & Trading*, 546 F.2d 1233 (5th Cir. 1977) where, in two related cases, the Fifth Circuit refused to hold a shipowner liable for injuries sustained by longshoremen as a direct result of their employers' negligence in failing properly to ventilate the hold and omitting adequately to secure pallets on the ship's deck. The court recognized, as we do, that it would be inimical to the intent of Congress to charge the shipowner with the stevedore's wrong. *See also Bess v. Agromar Line*, 518 F.2d 738 (4th Cir. 1975) (stevedore breaches his contractually created duty to supply dunnage boards). *Cf. Marant v. Farrell Line*, 550 F.2d 142 (3d Cir. 1977) (stevedore bears primary responsibility for safety of longshoremen).

Thus, it is our judgment that a shipowner cannot be liable in damages when he relinquishes control of the hold, then in a reasonably safe condition, to an experienced stevedore pursuant to a contract to supply services within its normal competence, *cf.* § 413, Restatement of Torts 2d (work of an independent contractor that creates "a peculiar unreasonable risk of physical harm . . . unless special precautions are taken . . ."), and the stevedore's negligence creates a latent, dangerous condition, unknown to the owner, upon which a longshoreman is injured. To hold otherwise, in our view, risks return to the concept of liability without fault for shipowners, which Congress so emphatically and recently rejected.

## III.

A careful consideration of the testimony below has convinced us that Munoz is barred as a matter of law from recovering damages from Flota Merchante Grancolombiana. Moreover, the appellee has not brought to our attention, either in his brief or at argument, any grounds that would warrant a new trial in the event the verdict is set aside by this court, nor are we of the view that such relief would be appropriate.

---

**3.** § 343A. Known or Obvious Dangers
(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

(2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated.
Restatement (Second) of Torts § 343A (1965).

Munoz was afforded every opportunity to present his case fully in the district court. Accordingly, we reverse the judgment of the district court and direct that judgment should be entered for the defendant-appellant dismissing the complaint.