**Valentino VALLE, Plaintiff,**

v.

**JUGOSLAVENSKA LINEJSKA PLOVIDBA, Defendant.**

**No. 74 Civ. 5677.**

United States District Court,
S. D. New York.

July 20, 1977.

---

Zimmerman & Zimmerman, New York City, for plaintiff; Edward D. Lory, of counsel.

Cichanowicz & Callan, New York City, for defendant; George T. Delaney, New York City, of counsel.

IRVING BEN COOPER, District Judge.

This seaman's personal injury action was tried before the Court and a jury on June 7–8, 1977. At the completion of plaintiff's case on the issue of liability, defendant moved for a directed verdict pursuant to Rule 50(a), Federal Rules of Civil Procedure. The issue was presented clearly by the trial memoranda and opening remarks of counsel: since absolute liability based upon a theory of unseaworthiness was no longer available (see *Longshoremen's and Harbor Workers' Compensation Act,* 33 U.S.C. §§ 901 et seq.; *Griffith v. Wheeling Pittsburgh Steel Corp.,* 521 F.2d 31, 40 (3d Cir.1975)), the sole question was whether plaintiff had sustained its burden on the issue of negligence.

From the memoranda and openings, we entertained doubts on the viability of plaintiff's claim, but decided to hear his evidence restricted to the issue of liability. Upon the completion of plaintiff's case, and after a review of the testimony adduced as well as the trial memoranda and relevant statutory and case authority, we decided to grant defendant's motion and dismiss the complaint. We now undertake to assign our reasons for that determination.

Plaintiff, a 51 year old longshoreman, was employed by Northeast Stevedoring to help discharge cargo from defendant's vessel, the KRALJEVICA. (Tr. 15, 23, 26)[1] He testified that on December 10, 1973, while unloading cargo from the No. 2 Hatch, he noticed that the cartons and pal-

---

1. "Tr." followed by a number refers to the official trial record.

lets (which contained nails) were improperly stowed. (Tr. 27–29) The improper stowage was caused by a shifting of the cargo during the voyage occasioned by heavy seas. (Tr. 31)

The gang of longshoremen, eight including plaintiff, discharged the cargo all day, with a break for lunch. (Tr. 34–35) Close to 6 p.m. that evening, the longshoremen had reached the bottom of the pile of cargo, at which point, plaintiff testified, they began to use a "hi-lo machine" (forklift) to unload the remaining cargo of nails. (Tr. 35)

Under and above the pallets of nails were dunnage boards upon which the cargo rested. Plaintiff described the cargo: "Palletized nails is about three feet high and two and a half feet wide . . . it is close to 2,000 pounds." (Tr. 40) The boxes of nails were sitting on top of skids, which plaintiff stated were "four by four high and about three by four long." (Tr. 41) The cargo was strapped to the skids "to make sure they (the nails) are not falling away." (Tr. 42) Plaintiff testified that the pile of nails "one on top of another, in tiers . . . was in bad condition" by which he meant "they were leaning," not resting flat on the boards. (Tr. 43)

Immediately prior to the accident, plaintiff testified that there were two tiers of nails left to be discharged. (Tr. 45) As the crew was attempting to lift the pallets so that they could insert the forklift's blades under them, plaintiff testified that a piece of dunnage hit him in the left leg. Asked for an explanation of how and why the dunnage came loose and struck him, plaintiff replied that "the pallets was [sic] listing (leaning) too much on the far end. . . ." (Tr. 52)

Two members of plaintiff's crew on the date of the accident also testified on plaintiff's behalf. Mr. Milenko Mijat supported plaintiff's testimony that the cargo had shifted during the trans-Atlantic voyage due to improper stowage, and that while it was being unloaded, the cargo was "listing offshore." (Tr. 78) Further, he testified that while the longshoremen were lifting the pallet to insert the forklift's blades underneath, he saw a piece of dunnage strike plaintiff on the leg. (Tr. 82)

Mr. John Musarella, the operator of the forklift (Tr. 94) also observed the pallets to be improperly stowed (Tr. 98) and witnessed the dunnage "come out and hit him in the leg." (Tr. 108) Thus, plaintiff's entire case may be summarized as follows: while unloading pallets of nails, the gang of longshoremen came upon a stow which was leaning or tilted due to a shifting of cargo during the oceanic voyage. In order to insert the forklift under the cargo to facilitate its discharge, the pallet had to be raised. In so doing, plaintiff was injured when a piece of dunnage came out and hit him in the leg.

■ Plaintiff claims that defendant shipowner is liable for his injury in that it failed to provide him with cargo properly stowed so as to permit its safe discharge. Upon a careful examination of the recent case law in the area, we cannot countenance such a theory of liability.

The Second Circuit in the very recent case of *Munoz v. Flota Merchante Grancolombiana*, 553 F.2d 837 filed April 25, 1977, interpreted the 1972 amendments to the *Longshoremen's and Harbor Workers' Compensation Act*, 33 U.S.C. §§ 901 et seq. These amendments limited the circumstances under which an employee of the stevedore could recover from the shipowner for on-the-job accidents. Specifically, the longshoreman could only recover from the shipowner if he could show that the shipowner was negligent and that such negligence was the proximate cause of the injury. Thus, the doctrine of "unseaworthiness" or absolute liability as a cause of action for longshoremen has been abolished. See *Griffith v. Wheeling Pittsburgh Steel Corp.*, 521 F.2d 31, 40 (3d Cir. 1975); *Napoli v. Transpacific Carriers Corp.*, 536 F.2d 505, 507 (2d Cir. 1976). Federal courts are now charged with the responsibility of fashioning a uniform law of negligence based not upon the doctrine of seaworthiness or "non-delegable duty" but rather by analogy to land-based common law tort principles. See *Munoz, supra.*

In the present case plaintiff adduced no proof from which a jury could have properly inferred that defendant shipowner had notice of the potentially unsafe condition of the stow of nails on which plaintiff was working when injured. At no time did plaintiff suggest how the personnel of the ship, who neither stowed the cargo nor oversaw the labors of the European stevedore who loaded the ship, could have become aware of the latent defect in the stowage of the cargo. We note that the particular stow of nails being lifted at the time plaintiff suffered injury was located in the deep recesses of the ship's hold and inaccessible to defendant.

If we might indulge in hyperbole, to insist that the shipowner should be apprehensive of some unknown, dreadful danger lurking below, one of which he has no notice, is to return to the pre-1972 theory of absolute liability upon the shipowner. On the contrary, the shipowner does not have a duty to discover and correct hidden defects in the cargo after his ship has been loaded by competent stevedores. Stowing and discharging of cargo from the holds of a vessel are the particular responsibility and within the expertise of the stevedore; plaintiff's attempt to impute a non-delegable duty of inspection to the shipowner would vitiate Congress' purpose in enacting the 1972 amendments. As the *Munoz* court stated: "it would be inimical to the intent of Congress to charge the shipowner with the stevedore's wrong." at 841. To hold the shipowner liable here would frustrate Congress' purpose of placing primary responsibility for the proper and safe conduct of the longshoremen's work on the stevedore. See *Marant v. Farrell Lines, Inc.*, 550 F.2d 142 (3d Cir. 1977).

Plaintiff submits that defendant had notice of the unsafe condition of the cargo because the shifting of cargo in a transoceanic voyage is a danger which should be anticipated. In support of this "notice" theory, plaintiff urges upon us the case of *Napoli v. Hellenic Lines, Ltd.*, 536 F.2d 505 (2d Cir. 1976), which case is clearly inapposite to the instant factual situation. In

*Napoli*, the defect complained of, i. e. the accumulation of snow under the plywood, was open and obvious. *Id.*, at 508, 509. Accordingly, the Second Circuit said, "where a shipowner has notice of an obviously dangerous condition, his duty of care to longshoremen exposed to such danger" is that set forth in the Restatement of Torts respecting the duty of a possessor of land in similar situations, that is, that the possessor is not liable for obvious dangers "unless the possessor should anticipate the harm despite such knowledge and obviousness." *Restatement of Torts 2d*, § 343A.

In the present case, there was not a scintilla of evidence that the defect was "open and obvious"; further, no testimony was adduced that defendant knew of the defect. Therefore, the facts of this case are closer to *Munoz* than *Napoli*. In *Munoz*, the Second Circuit said:

> UMS [the stevedore] stowed the cargo in such a manner as to create a latent, dangerous condition upon which one of its employees was injured. There was not a shred of evidence that the shipowner knew of the defect and it is undisputed that the owner delivered the premises to UMS in a safe condition. It would, in our view, contravene the clear congressional intent and scheme to approve recovery against Grancolombiana [the shipowner] in this case. at 840

The *Munoz* court went on to enunciate the present rule.

> the shipowner had no duty to supervise the minute details of work totally entrusted to the competence of the stevedore. Indeed, commercial reality and applicable union regulations preclude a rule that would require a non-expert constantly to intrude on the work of a master stevedore in the deepest recesses of the ship. at 840

Shifting of cargo, as plaintiff himself admitted (Tr. 30–31), is a common experience that stevedores frequently and regularly encounter. They are well aware of the perils inherent in unloading cargo that may have moved during the voyage. Consequently, stevedores who have exclusive su-

pervision over the discharge of cargo (the shipowner having relinquished control of the hold) would be in the best position to perceive dangers and react thereto. The failure of the stevedore to supply its employees with adequate tools or means to discharge cargo is not negligence chargeable to defendant shipowner. See *Munoz, supra.*

Plaintiff next argues that the shipowner is liable if negligent, even if the stevedore is also negligent, citing *Landon v. Lief Hoegh & Co.*, 386 F.Supp. 1081, 1084 (E.D. N.Y.1974). While this is undoubtedly the present rule, plaintiff must still sustain its burden on defendant's negligence; he has failed to do so.

Plaintiff further contends that defendant is liable for negligence in the construction of the ship, lack of safe appliances and for the failure to take reasonable precautions: "The latent dangers in respect of which the owner is under a duty to warn are those which are latent from the point of view of the workers . . . but which were known or ought to have been known by the owners." Pltf. Trial Memo., citing *Benedict on Admiralty*, 7th ed. Vol. 1a, ¶ 112, p. 6–4 et seq. This argument completely misses the point. The defects in the present case were latent to defendant, and it had no duty to inspect and discover them. In so ruling, we have adopted the *Munoz* "latent defect" rationale rather than the *Napoli* "obvious danger" analysis urged upon us by plaintiff.

The defects herein occurred in the deep recesses of the ship. Congress sought to encourage "safety within the industry by placing the duty of care on the party best able to prevent accidents." *Munoz*, at 839. Since the shipowner "ha[s] no duty to supervise the minute details" of the longshoremen's work, and since the shipowner is precluded from intruding on the work of the master stevedore "in the deepest recesses of the ship," it is clear that the shipowner is *not* the party best able to prevent accidents in situations such as presented here. It is the stevedore who, by the exercise of proper care, can best safeguard against unknown dangers lurking below in the deep recesses of the ship. See *Munoz*, at 839.

The Second Circuit has stated the present rule:

the vessel shall not be liable to a third party unless it is proven to have acted or failed to act in a negligent manner such as would render a land based third party in non-maritime pursuits liable under similar circumstances. *Munoz*, at 840.

In this case there was no evidence that defendant acted in a negligent manner. Accordingly, we were constrained to and did dismiss the complaint.

SO ORDERED.