**Enos JOHNSON, to his own use and to the use of Liberty Mutual Insurance Co.**

v.

**MOORE–McCORMACK LINES, INC.**

Civ. No. HM76–1459.

United States District Court, D. Maryland.

Nov. 29, 1978.

Bernard M. Goldstein, Baltimore, Md., for plaintiff.

Randall C. Coleman, Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

HERBERT F. MURRAY, District Judge.

This is a personal injury action by a longshoreman against a vessel owner under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. Section 901, et seq. Plaintiff Enos Johnson claims injury as the result of an accident which occurred in the course of loading operations aboard the vessel MORMACVEGA owned by the defendant Moore-McCormack Lines, Inc., which occurred on October 12, 1973 at the Dundalk Marine Terminal in the Port of Baltimore. Suit was instituted on September 30, 1976 and the matter is presently before the court on a motion for summary judgment filed by the defendant.

The accident occurred in the vessel's number 5 reefer space which is located in the lower level of the vessel's number 6 hold, the aftermost hold of the vessel. Reefer spaces are designed to carry refrigerated cargo but are frequently used to carry other non-refrigerated cargo.

The MORMACVEGA was equipped with cargo hatch ventilating fans and systems of ventilation trunks and duct work in five of six hatches. The reefer spaces in the aftermost, or number 6 hatch, where the accident occurred, are unventilated and are served by ducting and diffuser fans designed to recirculate extremely cold air over, around and through refrigerated cargo during the course of a voyage.

When the vessel arrived in Baltimore on October 12, 1973, the number 5 reefer contained frozen fish destined for discharge in Baltimore. Before the longshoremen commenced discharging the frozen fish, the circulating fans and refrigerating machinery were turned off at 0815 Hours on October 12, 1973. At approximately 0945 Hours the gang of longshoremen entered the number 5 reefer space to discharge fish, the discharge being completed at approximately 1115 Hours.

At 1445 Hours the longshoremen moved into the number 6 lower hold to load steel sheets or coils on skids in the number 5 reefer space. Sometime between the beginning of the loading of the steel and the completion of the loading at 1535 Hours, a gasoline-powered forklift tractor owned by the stevedore, I.T.O., was lowered into the number 5 reefer and operated by the plaintiff Johnson to load cargo. In the course of operating the forklift truck in the confined and unventilated space, the plaintiff became ill due to inhalation of carbon monoxide fumes from the tractor and was removed from the hold by a stokes litter and taken to the hospital.

Defendant makes two contentions in the motion for summary judgment. First, defendant argues that the action is barred by reason of laches. Second, defendant contends that since the gasoline-powered forklift tractor was owned and operated by I.T.O. Corporation of Baltimore, and since I.T.O. maintained complete operational control over the cargo operations, the complaint does not state any grounds for relief under which defendant may be held liable after the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act. Defendant asserts that these Amendments placed upon the stevedoring contractor the primary duty of supervising cargo operations and protecting the health and safety of its employees.

Turning first to the laches defense, the court is not persuaded on the admitted facts that laches should bar this suit. First, it is significant that the action was brought within the analogous limitations period of three years provided by state law. As the Court of Appeals for the Second Circuit stated in *Larios v. Victory Carriers, Inc.,* 316 F.2d 63, 66 (2d Cir. 1963), when an action is

"brought after the expiration of the state limitation period, a court applying maritime law asks why the case should be allowed to proceed; when the suit, al-

though perhaps long delayed, has nevertheless been brought within the state limitation period, the court asks why it should not be."

In seeking to provide an answer as to why the suit should not be allowed, defendant makes four points. First, it says it received no notice of the claim until almost three years had elapsed. Second, that no investigation was conducted at the time of Johnson's injury and it is difficult to conduct one so long after the injury occurred. Third, that members of the crew of the vessel who were aboard at the time of the accident cannot now recall the occurrence because of the lapse of time. Finally, defendant points out that due to the death of W. C. Yeager who was chief engineer on board the MORMACVEGA at the time of the accident, it is deprived of the testimony of the crew member who was in charge of all aspects of the air recirculating system in the vessel's reefer spaces.

■ These considerations in the court's view do not mount up to such a claim of prejudice as to preclude the plaintiff from pursuing this action. Several factors show the occurrence was of sufficient moment to alert the vessel to a need for investigation. First, a log entry on October 12, 1973 makes reference to the occurrence:

"1540 Hours. Two men sent to City Hospital in ambulance. Claimed feeling bad from air in number 6 hold."

Also, the stevedore foreman's daily time report shows work was discontinued on October 12 from 3:30 p. m. to 5:00 p. m. "a/c gas fumes". Additionally, the vessel received and approved a bill for "detention time; labor unable to work cargo in reefer a/c fumes". Representatives of OSHA made an investigation aboard the ship shortly after the occurrence and submitted a report which was available to the defendant and which showed that all five of the men who were in the hold, including Johnson, were treated at the hospital for inhalation of carbon monoxide fumes. It is doubtful that the crew members whose affidavits were submitted in support of the summary judgment motion had much more

in the way of concrete information at the time of the occurrence than they did when their affidavits were taken, since they were not in the hold when the accident occurred and would have been unable to go into the hold immediately after the occurrence because of the concentration of gas. Also, it is difficult to believe that the death of the chief engineer would eliminate all possibility of the defendant being able to provide testimony on the operation of the air recirculating system in the vessel's reefer spaces. In the light of these facts, the court concludes that defendant has failed to make out a case for the application in this action of the admiralty doctrine of laches.

The issue of whether plaintiff has a cognizable claim in negligence against the vessel under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act is more difficult to resolve. However, a study of the legislative history and the cases decided under the Act lead the court to the conclusion that summary judgment should be granted to the defendant. Although not herein separately enumerated, this opinion contains the court's findings of fact and conclusions of law, as required by Rule 52, Federal Rules of Civil Procedure.

It would unduly prolong the opinion to sketch the history and background of the 1972 revisions. That history has been traced in *Landon v. Lief Hoegh*, 521 F.2d 756 (2d Cir. 1975), *cert. denied*, 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642 (1976); *Griffith v. Wheeling-Pittsburgh Steel Corp.*, 521 F.2d 31 (3d Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976); *Ramirez v. Toko Kaiun K.K.*, 385 F.Supp. 644 (N.D.Cal.1974); and *Lucas v. "Brinknes" Schiffahrts Ges.*, 379 F.Supp. 759 (E.D.Pa.1974).

The basic factual dispute in this case hinges upon which of two administrative regulations applies to the fact situation underlying the accident. Simply stated, the contentions of the parties are as follows. The ship asserts that it hired I.T.O. Corporation of Baltimore to perform stevedoring services on its vessel. The ship is entitled

to rely on the expertise of the stevedore in performing loading and unloading operations. The Safety and Health Regulations for Longshoring specifically provide that the employer (i. e. the stevedore) is responsible for making atmospheric tests when internal combustion engines are used in the hold of the ship, and the employer is responsible for seeing to it that supplementary means of portable ventilation are used to reduce gas concentrations when the natural ventilation or the ship's ventilating system are insufficient to keep carbon monoxide concentrations within allowable limits. If such supplementary means of ventilation are inadequate, then the duty devolves on the employer to remove its employees from the compartment. The text of the regulation (now 29 C.F.R. Section 1918.93) is as follows:

"Ventilation and atmospheric conditions.

(a) Ventilation requirements with respect to carbon monoxide:

(1)(i) When internal combustion engines exhaust into a hold, an intermediate deck, or any other compartment, the employer shall see that tests of the carbon monoxide content of the atmosphere are made with such frequency as is found by test to be necessary in the type and location of the operation, and under the conditions existing, to insure that dangerous concentrations do not develop. Such tests shall be made in the area in which employees are working, by persons competent in the use of the test equipment and procedure. Where operations are located in a deep tank or refrigerated compartment the first test shall be made within one half hour of the time the machine(s) start.

(ii) The carbon monoxide content of the atmosphere shall be maintained at not more than 50 parts per million (0.005%) as a time weighted average, and employees shall be removed from the compartment if the carbon monoxide concentration exceeds 100 parts per million (0.01%). The term 'time weighted average' means that for any period of time in which the concentration exceeds 50 parts per million, it shall be maintained at a corresponding amount below 50 parts per million for an equal period of time.

(iii) When neither natural ventilation nor the vessel's ventilating system, where fitted, is adequate to keep the carbon monoxide concentration within the allowable limits set forth in this paragraph, the employer shall use supplementary means of portable ventilation in such size and number and so arranged as to bring such concentration within such limits before work is resumed.

(2) A record of the date, time, location, and results of the tests required by subparagraph (1) of this paragraph shall be maintained for at least 30 days after the work is completed. The record shall be available for examination by representatives of the Bureau of Labor Standards." [1]

The vessel further contends that since the legislative history shows Congress intended the primary responsibility for employee safety to be on the stevedore, this regulation implements the congressional purpose. Since the regulation places the ultimate responsibility on the longshoreman's employer, the vessel argues it cannot be pursued in a negligence action even if a comparable Coast Guard regulation purports to impose duties on the vessel's officers to take steps

---

1. In connection with this regulation, its subpart (c) should also be noted. It provides:

"(c) Before employees are permitted to enter or work in any stowage space or tank, the employer shall ascertain from the officer in charge of the vessel, or the vessel's agent or operator, whether explosive, poisonous, noxious, or gaseous cargoes have been carried or are stowed therein, or whether dry ice has been used as a refrigerant therein, or whether such places have been fumigated, or whether

there is a possibility of oxygen deficiency. Upon establishing that any of such conditions may exist, the employer shall ascertain from the officer in charge of the vessel, if he is properly equipped and qualified so to evaluate, the condition of the work place with respect to atmospheric contaminants or deficiencies. If the officer in charge of the vessel is not equipped or qualified to carry out such evaluation, this shall be done by another person qualified and equipped to do it."

to insure that concentrations of carbon monoxide gas do not exceed allowable limits.

Plaintiff on the other hand maintains that his complaint states a case of actionable negligence against the defendant, since it alleges defendant's negligent failure to fulfill customary maritime duties, and the violation of a basic health and safety rule imposed upon the vessel and her personnel by a Coast Guard regulation dealing with allowable concentrations in the atmosphere in the working area. Plaintiff further contends that the failure to make sufficient inspections and tests of the atmosphere and to provide adequate and safe ventilation in the enclosed reefer space after the vessel's officers were or should have been aware of the dangerous concentration of carbon monoxide in the space, constitutes actionable negligence. The Coast Guard regulation on which the plaintiff relies, Title 46 C.F.R. part 97.70–15(c) provides as follows:

"Spaces exposed to carbon monoxide or other hazardous vapors from exhausts of power-operated industrial trucks shall have adequate ventilation. The senior deck officer shall see that tests of the carbon monoxide content of the atmosphere are made as frequently as conditions require to insure that dangerous concentrations do not develop. Such tests shall be made in the area in which persons are working, by persons acquainted with the test equipment and procedure. The carbon monoxide concentration in the holds and intermediate decks where persons are working shall be maintained at not more than 50 parts per million (0.005%) as a time-weighted average, and persons shall be removed from the area if the concentration exceeds 75 parts per million (0.0075%). When necessary, portable blowers of adequate size and location shall be utilized."

Plaintiff further contends that the Coast Guard regulation is not superseded by the counterpart in the Safety and Health Regulations for Longshoring, since the longshoring regulations specifically state, "* * * Nor is it the intent of these regulations to relieve such owners, operators, agents or masters of vessels from responsibilities or duties now placed upon them by law, regulation or custom." 29 C.F.R. Section 1918.2. Plaintiff also argues that there is no conflict between the two regulations. He points out that both are designed to guard against the danger of carbon monoxide asphyxiation to men working in enclosed spaces aboard ship, such as the unventilated reefer in this case. Each regulation, he contends, is addressed to personnel within the respective jurisdictional area of the regulating agency, that of the Coast Guard imposing duties directly on the vessel and her officers and the longshore regulation imposing duties directly upon the stevedore officials. Thus, he contends, the two regulations are completely consistent with each other, and the Coast Guard regulation should serve to support a third-party action against the vessel based on a negligent failure to adhere to the regulation.

There is authority in this Circuit which supports plaintiff's position. In *Speller v. American Export Lines*, 1977 AMC 501 (E.D.Va. 1975), six longshoremen working in the lower hold of a vessel were overcome by carbon monoxide poisoning resulting from the use of a gasoline-powered tow motor in the hold. The case was tried to a jury on the basis of claimed negligence on the part of the vessel in that (1) its officers admittedly failed to test for carbon monoxide in the lower hold though they knew that a gasoline-powered tow motor was being operated in the hold; (2) that no ventilation was provided by the vessel though it was frequently requested with concurrent complaints to the vessel of the air quality; and (3) that while unloading was proceeding in the lower hold, the vessel partially replaced the hatch covers in the space above the number 2 hold to expedite loading of the 'tween-deck area, which action precipitated the concentration of carbon monoxide to the detriment of the plaintiffs. District Judge John A. MacKenzie of the United States District Court for the Eastern District of Virginia, Norfolk Division, refused to set aside a verdict finding that the ship was negligent, stating:

"We hold that the 'Safety and Health Regulations for Longshoring', as promulgated by the Department of Labor, do not preempt the Coast Guard regulations which deal with the imposition of additional duty upon the ship owner as set forth in 46 C.F.R. 97.70–15 * * * The Department of Labor Regulations deal with the responsibility of an *employer*-stevedore to its own longshoremen, and do not preclude the Coast Guard from establishing a duty upon a ship owner to make tests for the protection of the health of persons, including longshoremen, in the hold of a vessel in the presence of an operating gasoline combustion engine of a tow motor."

On the other hand, in the case of *Shields v. Moller*, No. 74–1032 (E.D.Pa., Jan. 23, 1975), the plaintiff longshoreman also sought damages for injuries following inhalation of fumes from a gas-operated forklift in an unventilated hold. The forklift had been brought aboard the vessel to replace an electric chisel which had malfunctioned. Following a non-jury trial, the Honorable Daniel H. Huyett held the defendant ship owner not liable for plaintiff's injury stating:

"It would undermine and completely be contrary to the congressional purpose of the 1972 amendments to hold a ship owner liable where the stevedore company had complete control of the work being done and where the stevedore company had brought the gas forklift truck on board * * * and directed its operation and * * * where the ship had no notice or knowledge of the allegedly dangerous condition."

The same result was reached in *Gay v. Ocean Transport & Trading, Ltd.*, 546 F.2d 1233 (5th Cir. 1977). There Roosevelt Gay, a longshoreman employed by Atlantic Stevedoring Co., was assigned to operate a propane forklift in an unventilated reefer compartment aboard the M/V Prometheus. To remove the fumes caused by the forklift, a blower was put aboard the vessel by the stevedore. Unfortunately, the blower's air hose was not long enough to reach into the reefer compartment, and Gay and other longshoremen working with him were overcome by carbon monoxide fumes.

Gay admitted that the operators of the vessel had no knowledge that the dangerous condition existed. Instead, he sought to predicate liability on the vessel by contending that the OSHA regulation involved in the present case, 29 C.F.R. 1918.93(a)(1)(i) established a standard of care for a negligence action against the vessel.

Circuit Judge Tjoflat, speaking for the Fifth Circuit Court of Appeals, said in response to this argument:

"We disagree. The vessel had no similar duty to check the carbon monoxide content of the compartment. Gay's argument is, in effect, that the vessel has a nondelegable duty to provide a longshoreman with a safe place to work. But this is exactly the type of liability without fault concept from which Congress sought to free vessels by the passage of the 1972 Amendments (citations omitted)." *Id.* at 1239.

The court affirmed a summary judgment for the defendant.

It does not appear that in *Shields v. Moller* and *Gay v. Ocean Transport & Trading, Ltd.* the court had its attention called to the parallel Coast Guard regulation. The basic issue this court has to decide is whether the existence of that regulation calls for a different result in this case.

In order to determine that issue, consideration must be given to other cases which have sought to flesh out what Congress intended by preserving in the 1972 amendments a cause of action for "negligence of the vessel." Fortunately, guidance is provided by other decisions of this court and the United States Court of Appeals for the Fourth Circuit.

In *Anuszewski v. Dynamic Mariners Corp. Panama*, 391 F.Supp. 1143 (D.Md. 1975), longshoremen were injured when a cargo hook dislodged an unsecured beam causing it to fall into the hold and strike the longshoremen.

Judge Frank A. Kaufman held that the fact that the beam was unsecured was a violation of the Safety and Health Regulations for Longshoring, and the failure of the vessel to lock or fasten the beams

"constituted negligence on the part of the shipowner since the shipowner, at least in terms of knowledge of the crew member stationed to prevent pilferage, and in terms of those responsible for handling the ship from the time of its departure from New York, knew or should have known of the violation of the safety regulation. *Provenza v. American Export Lines, Inc.,* 324 F.2d 660, 665 (4th Cir. 1963). But that negligence on the part of the ship is not actionable negligence in a post-1972 setting, for reasons which are discussed *infra.*"

Judge Kaufman noted that the House Committee Report prepared in connection with the 1972 amendments established that land-based principles of law apply to longshoremen's claims for damages against third parties and that a ship has no different liability to longshoremen employed to work aboard the ship by a stevedoring company than the owner of land-based property owes to the employees of an independent contractor who performs work on that property. Applying principles of land-based tort law as set out in Sections 343 and 343A of the Restatement (Second) of Torts, Judge Kaufman declined to hold the shipowner liable where the longshoremen and members of their gang did discover and realize the danger from the unfastened beam and the shipowner could reasonably have expected that the longshoremen would have discovered the unsecured beam and would have protected themselves by removing the beam or by fastening it. On appeal, the Court of Appeals for the Fourth Circuit affirmed, 540 F.2d 757 (1976), *cert. denied,* 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977), saying that Judge Kaufman's conclusions were "in accord with the decisions of the several courts who have had occasion to consider" the 1972 amendments (citations omitted). *Id.* at 759.

In *Frasca v. Prudential-Grace Lines, Inc.,* 394 F.Supp. 1092 (D.Md.1975), the jury in a maritime slip and fall case had found the plaintiff longshoreman, his stevedore employer and the vessel owner all negligent in varying percentages. The condition causing the fall was a greasy ship's ladder. On the evidence, a reasonable jury could have found the greasy condition existed when the longshoremen were given control of the work area; also that members of the vessel's crew knew or should have known of the condition, and that it involved an unreasonable risk of harm if not corrected. Additionally, however, other evidence showed that the danger was open and obvious and known to the plaintiff, and the men continued to use the ladder for several hours to go in and out of the hold without any steps being taken by anyone to correct the condition. Under these circumstances, Judge C. Stanley Blair granted a judgment n. o. v. for the shipowner, since "the shipowner had no reason to expect that the stevedore and longshoremen would fail to protect the plaintiff against a danger which they knew existed, which is frequently encountered in the type of work, and which could be so easily avoided." 394 F.Supp. at 1102.

In reviewing the applicable law following the 1972 amendments, Judge Blair noted:

". . . once the manner and area of work is turned over to the exclusive control of the independent contractor (stevedore), the shipowner, like the landowner, has no duty to supervise the details of the independent contractor's methods of operation to see if any dangerous conditions have arisen therefrom. (omitting citations) Thus the shipowner cannot be liable for injuries caused by his failure to inspect and discover dangerous conditions arising in the work area from the methods of the unloading operations, unless the owner had actual or constructive knowledge of the condition obtained by independent means. (omitting citations) Absent such knowledge by the owner, the land-based duty imposes liability solely upon the independent contractor if it is found negligent for creating such conditions and permitting them to continue." *Id.* at 1099.

Cases like *Anuszewski* and *Frasca* just discussed have been explained as follows:

"The consistent philosophy of these decisions is that in the ordinary situation shipowners are in no position to learn of unsafe conditions or methods arising during the stevedore's operations; when shipowners do learn of such dangers, ordinarily the stevedore and his employees will have an equal or greater awareness, so that the danger can be said to be open and obvious; and that the safety of stevedoring and other such operations is the primary and usually the sole responsibility of the stevedore."

Robertson, Negligence Actions by Longshoremen Against Shipowners Under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act, 7 Jour. of Maritime Law and Commerce 447, 473.

As the Fourth Circuit Court of Appeals pointed out in *Riddle v. Exxon Transp. Co.*, 563 F.2d 1103 (1977), a shipowner can still be liable even where the condition is open and obvious, if he "should have realized that despite such knowledge or obviousness plaintiff would not be protected." In that case, a shipyard employee was injured in a fire and gas explosion on the Exxon Bangor while she was undergoing repairs performed by the Norfolk Shipbuilding and Drydock Corporation under a contract with the vessel's owner, Exxon Transportation Company. Although the trial judge in instructing the jury did not qualify the vessel's immunity for "open and obvious" dangers in line with the modern rule, the court held this to be at most harmless error where the dangerous condition resulting in injuries to a longshoreman or ship repair worker is due to negligence of the stevedore or shipyard without the knowledge or participation of the shipowner. The court observed this would be so irrespective of whether the condition resulting in the injuries to plaintiff was "open and obvious" or not. *Id.* at 1112. The court found support for its conclusion in four decisions which it characterized as well-reasoned; *Hurst v. Triad Shipping Co.*, (3rd Cir. 1977), 554 F.2d 1237; *Munoz v. Flota Merchante Grancolombiana, S.A.* (2d Cir. 1977), 553 F.2d 837; [2] *Gay v. Ocean Transport & Trading, Ltd.* (5th Cir. 1977), 546 F.2d 1233; and *Teofilovich v. d'Amico Mediterranean/Pacific Line*, (C.D.Cal.1976), 415 F.Supp. 732. In the *Gay* case, as previously noted, the Fifth Circuit Court of Appeals was dealing with the same type of fact situation involved here—injuries due to inhalation of carbon monoxide fumes from operation of a forklift tractor in a confined space aboard the vessel.

In *Chavis v. Finnlines Ltd., O/Y*, 576 F.2d 1072 (1978), the Fourth Circuit Court of Appeals again considered a contention on behalf of an injured longshoreman that a trial judge erred in charging a jury and omitting any reference to the final limiting clause of Section 343A(1) of the Second Restatement of Torts (1965) which would have rendered the shipowner liable if it was to be anticipated that harm would result to an invitee despite the obviousness of the dangerous condition.

In *Chavis*, longshoreman's counsel relied heavily upon the statement of the Second Circuit Court of Appeals in *Napoli v. Hellenic Lines, Ltd.*, 536 F.2d 505 (2d Cir. 1976) that "We believe that where a shipowner has notice of an obviously dangerous condition, his duty of care to longshoremen exposed to such danger should be set forth in Section 343A of the Restatement of Torts." 536 F.2d at 509.

Section 343A(1) reads:

"Known or Obvious Dangers

(1) A possessor of land is not liable to his invitees for physical harm caused to

2. Since the decision in *Munoz*, what Judge Friendly has described as a "discordant chorus" has developed in the Second Circuit as to the circumstances under which a shipowner may be held liable under the 1972 Amendments. Compare *Cox v. Flota Merchante Grancolumbiana*, 577 F.2d 798 (2nd Cir. 1978) with *Canizzo v. Farrell Lines, Inc.*, 579 F.2d 682 (2nd Cir. 1978), Judge Friendly in the latter case dissenting from the holding as to liability. For an attempt by a District Judge in the Second Circuit to harmonize the discord, *see Pastorello v. Koninklijke Nederl Stoomb Maats*, 456 F.Supp. 882 (E.D.N.Y.1978).

them by any activity or condition on the land where danger is known or obvious to them, *unless the possessor should antici-pate the harm despite such knowledge or obviousness*" (emphasis added)

The facts in *Chavis* were that the long-shoremen had loaded into the lower hold of the vessel a cargo of logs, which were cov-ered with a red clay mud, creating a smooth, slippery surface. The logs were successfully loaded, but remained exposed to rainy weather due to the fact that the hatch was left open. Thereafter, the long-shoremen started to load bales of herbs which were to be stowed on top of the logs. While handling one of the bales, plaintiff injured his back, allegedly as a result of slipping on the slippery logs.

On these facts, Senior District Judge Walter E. Hoffman, speaking for the court, said:

"While we feel that *Napoli, supra,* con-tains a correct exposition of law, we nevertheless are constrained to limit its applicability to its facts. In *Napoli,* there was no question that the shipowner, *which was acting as its own stevedore,* allowed the defect to be created before the longshoremen began work. However, under the facts of the present case, it appears that the stevedore created the alleged defect.

"The evidence was that the logs were caked with reddish mud and were slip-pery. The loading took place on a rainy day. The hatch above the number six lower hold was left open, exposing the logs to rain. The entire longshoring op-eration was under the control of Tide-water. Appellee argues, and we agree, that there was no slippery condition in the hold prior to the time Tidewater be-gan its operations. Rather, the slippery condition was created by the stevedore." *Id.* at 1079

Under the circumstances, the court found the result controlled by its prior holding in *Riddle,* where it said:

"But, whether the statement of the Dis-trict Court in the challenged instruction was erroneous for not qualifying the ves-sel's immunity for 'open and obvious' dangers in line with the modern rule (i. e. Sec. 343A) is irrelevant in this case and its use by the District Court would, if erroneous, be at most harmless error. This is so because plaintiff's injuries re-sulted solely from the negligence of the (stevedore) and its employees; and, irre-spective of the language of Sec. 343 and Sec. 343A of the Second Restatement, a vessel is unquestionably exempt under both the letter and the intent of the 1972 Amendments from any liability for inju-ries resulting from the negligence of the (stevedore) and its employees. And this is so, irrespective of whether the condi-tion resulting in plaintiff's injuries was 'open and obvious' or not. Such has recently been the clear holding in four well-reasoned decisions. *Hurst v. Triad Shipping Co.,* 554 F.2d 1237 (3d Cir. 1977); *Munoz v. Flota Merchante Grancolombia-na, S.A.,* 553 F.2d 837 (2d Cir. 1977); *Gay v. Ocean Transport & Trading, Ltd.,* 546 F.2d 1233 (5th Cir. 1977); and *Teofilovich v. d'Amico Mediterranean/Pacific Line,* 415 F.Supp. 732 (C.D.Cal.1976)." 563 F.2d at 1112.

Against the background of these cases the problem the court has to resolve is this: if, after the 1972 Amendments, the Safety and Health Regulations for Longshoring place the duty on the stevedore to test for and guard against carbon monoxide concen-trations in spaces aboard a vessel, and a Coast Guard regulation places the same or similar duties on the senior deck officer of the crew of the vessel, does the Coast Guard regulation give a longshoreman forklift op-erator overcome by carbon monoxide a cause of action against the vessel when adequate tests have not been made or prop-er precautions taken?

The court does not accept defendant's contention that the Coast Guard regulation has no application to longshoremen. It comes into play either as to power-operated trucks carried on board a vessel *as part of the vessel's equipment* (46 C.F.R. 97.70–1(a)(1)), or as to power-operated trucks *placed on board* vessels for handling materi-

als. (46 C.F.R. 97.70–1(a)(2)) Clearly, longshoremen would be the only persons placing such a truck aboard the vessel, and when the regulation requires tests for carbon monoxide "in the area in which persons are working", the longshoremen would ordinarily be the persons referred to. 46 C.F.R. 97.70–15(c).

In the present case, it does appear that crew members were aboard the vessel while the cargo operations were going forward, but there is no indication that they retained any right of control over the operations of the stevedore, or indeed that any crew member was specifically aware of how the operation in the reefer space was being conducted. Affidavits of crew members submitted with the motion for summary judgment indicate that the ranking officers on the ship were unaware of any of the circumstances surrounding the casualty (Affidavits of Paul J. Giachetti, Master; Edward J. Stark, Chief Officer; William Wong, relieving Third Officer). This is not a case like *Rios v. Empresas Lineas Maritimas Argentinas,* 575 F.2d 986 (1st Cir. 1978), where the chief officer of the vessel requested that a gasoline-powered forklift be brought aboard, and the stevedore immediately objected on grounds that the dangers of carbon monoxide poisoning from use of the forklift in the hold were substantial and received assurances from the chief officer concerning adequate ventilation inside the hold. Nor is it a case like *Speller v. American Export Lines, supra,* where the longshoremen frequently requested the vessel to provide ventilation and complained of the air quality. Instead, this is a case where the forklift was brought on board by the stevedore and used by the longshoremen without any active role being taken or supervision of the work being conducted by the vessel's officers. Apparently, also a stevedore employee was taking readings of the carbon monoxide level in hatches 5 and 6 on October 12, 1973 as evidenced by sheets attached to the OSHA investigation, furnished with plaintiff's answer to defendant's motion for summary judgment. Tests were made in hatch number 5 at 10:15 a. m., 10:20 a. m., 2:05 p. m. and 2:10 p. m.

There was also a test made in the reefer space in number 6 hatch at 4:05 p. m. which showed a heavy concentration (1000 P.P.M.) of carbon monoxide, and alongside the entry appears the comment "Stop men from working." According to the investigation report, the forklift tractor had been brought into the number 6 reefer space at 2:45 p. m. The plaintiff was taken out of the hatch 55 minutes later at 3:40 p. m. Thus it would appear that there was a violation of that part of the OSHA regulation which provides "Where operations are located in a deep tank or refrigerated compartment the first test shall be made within one half hour of the time the machine(s) start." Here no test was made for an hour and twenty minutes, and it appears likely that the test was made then because of the casualty which had occurred. This was an omission by the employer stevedore on whom is placed the primary responsibility for the safety of the workmen in the hatch, including the plaintiff.

Although tests were being made by the stevedore of the carbon monoxide level in the hatches, if the Coast Guard regulation has application, plaintiff could still argue that the tests were not being made with sufficient frequency under the provision of 46 C.F.R. 97.70–15(c) which reads:

"The senior deck officer shall see that tests of the carbon monoxide content of the atmosphere are made *as frequently as conditions require* to insure that dangerous concentrations do not develop." (emphasis supplied)

The argument would be that where control of the vessel's hatches has been turned over to the stevedore, and the stevedore undertakes to perform his duty of monitoring gas concentrations, there remains a residual responsibility in the senior deck officer to see that the tests are being made with sufficient frequency.

A similar kind of contention was made in *Hurst v. Triad Shipping Co.,* 554 F.2d 1237 (3rd Cir. 1977), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977), cited with approval and discussed in *Riddle v. Exxon*

*Transportation Co.,* 563 F.2d 1103 (4th Cir. 1977). In *Hurst,* two longshoremen were injured when wire legs suspended from the hook of a crane cable rubbed against the side of a hatch coaming, causing the legs to be dislodged and fall into the hold onto the longshoremen. The vessel's chief officer was in the vicinity of the hatch during the entire course of the unloading, observing the operations of the stevedore. The chief officer denied noticing that the hook on the crane was not equipped with a safety catch to prevent the wire legs from slipping off (the crane was stevedore equipment). The plaintiff argued a jury question was presented on the question of the chief officer's knowledge. The trial judge disagreed, and granted the vessel's motion for a directed verdict.

On appeal, the Third Circuit Court of Appeals, after noting that traditional expansive concepts of maritime tort liability embodied in cases decided before the 1972 amendment of Section 905(b) could not be judicially imported into that section under the guise of "nondelegable duty" or any other synonym for liability without fault, turned to plaintiff's argument that the court should apply Section 318 of Restatement (Second) of Torts. That section provides:

"If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor

"(a) knows or has reason to know that he has the ability to control the third person, and (b) knows or should know of the necessity and opportunity for exercising such control."

The plaintiff in *Hurst* contended that the chief officer owed them a duty "to see that the stevedore did not endanger them by using an unsafe hook on the stevedore's crane." They urged that he should have known about the unsafe activity of the stevedore and "exercised the ship's ultimate authority" to halt the unsafe method of work.

In rejecting this argument, the Third Circuit Court of Appeals, speaking through Circuit Judge Hunter, stated:

"We cannot accept appellants' theory for two reasons. First, and most importantly, the basis of liability under section 318 seems to be precisely that sort of 'nondelegable duty' that Congress—as noted above—sought to eliminate by amending section 905(b). Application of section 318 would impose upon the shipowner a duty constantly to oversee the stevedore's methods of operation in order to prevent any dangerous conditions created by the stevedore from threatening the stevedore's own employees or others. Yet Congress quite clearly expressed its intention that shipowners not be held liable 'for acts or omissions of stevedores or employees of stevedores . . . ; for the manner or method in which stevedores or employees of stevedores . . . perform their work . . .; for gear or equipment of stevedores or employees of stevedores . . . whether used aboard ship or shore . . ., or for other categories of unseaworthiness which have been judicially established.' Thus, judicial imposition upon shipowners of a duty of control via section 318 of the Restatement would amount to a reestablishment of the 'nondelegable' duty that amended section 905(b) was intended to eliminate." (footnotes omitted). *Id.* at 1248–1249

Instead of section 318, the court considered that the appropriate section of the Restatement to apply, comporting with congressional intent, was section 409, which provides:

"Except as stated in Secs. 410–429, the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants."

The court observed that sections 416 through 429 are rules of vicarious liability, making the employer liable for the negli-

gence of the independent contractor, irrespective of whether the employer himself has been at fault. The court concluded that to apply those sections would be to reactivate that concept of nondelegable duty Congress sought to eliminate in the relations between shipowner and stevedore.

■ This court concludes from the opinion in *Hurst* that a vessel which has not retained control over the details of a stevedore's work cannot be held liable for injuries occurring after control of the vessel's cargo spaces has passed to the stevedore which result solely from the activity of the stevedore.[3]

Just as, the court in *Hurst* refused to impose liability for mere non-action on the part of the vessel's officers in the presence of a dangerous condition brought about by the stevedore, so the court in the present case concludes as a matter of law that no negligence on the part of the vessel's crew can be predicated on its mere inaction as a dangerous condition developed resulting from the operation by the stevedore of a gasoline-powered forklift owned by it which it brought aboard the vessel. Awareness of the risk of harm under such circumstances was a matter within the competence of an expert stevedore, and the vessel could reasonably anticipate that the stevedore would take the steps mandated by the OSHA regulation to protect its own employees from exposure to concentrations of carbon monoxide from the forklift the stevedore itself brought on board the vessel. As Judge Friendly expressed it in his dissenting opinion in *Canizzo v. Farrell Lines, Inc.*:

"In my view Congress did not mean to subject the ship to liability for every dangerous condition known or knowable to it when it had a right to assume that this would be remedied by the employer, as Sec. 941(a) requires. The typical cases where the ship was to be liable under Sec. 905(b) would be for conditions of which it was or should have been aware but of which the employer was not and could

not reasonably be expected to be and for affirmative acts of negligence for which the employer bore no responsibility (e. g., when the crew carelessly operated the ship's machinery used in loading and unloading or when such machinery was defective)." 579 F.2d 682, 688.

■ To the extent the court has just indicated, the 1972 Amendments under the facts of this case have limited the applicability of the parallel Coast Guard regulation. This is not to say that there may not be an effective field of operation for the regulation where some affirmative act of negligence on the part of the vessel's crew would warrant its application. That, however, is not this case.

For the reasons herein outlined, it is this 29th day of November, 1978, *Ordered* that defendant's motion for summary judgment be, and the same hereby is, *Granted.*

---

**3.** Chief Judge Joseph S. Lord, III reached the same conclusion in *Blackburn v. Prudential Lines, Inc.*, 454 F.Supp. 1302 (E.D.Pa.1978).